UNITED STATES of America,
Plaintiff-Appellee,

v.

Elorance JAMES, William Stanfield,
and Antonio Vasquez,
Defendants-Appellants.

No. 74–2067.

United States Court of Appeals,
Fifth Circuit.

March 26, 1975.

Rehearing and Rehearing En Banc
Denied May 9, 1975.

Sam C. Bashara, Van G. Hilley, San Antonio, Tex., for James.

J. Joe Harris, San Antonio, Tex. (Court-appointed), for Stanfield.

Ruben Montemayor, San Antonio, Tex. (Court-appointed), for Vasquez.

William S. Sessions, U. S. Atty., Joel D. Conant, Jim Bock, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before THORNBERRY, MORGAN and CLARK, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

On November 3, 1973, Georgia Bennett, a government undercover agent, arrived at the residence of appellant Elorance James in San Antonio, Texas. She had gone there pursuant to the instructions of Clarence Jackson for the purpose of traveling to another location and consummating a heroin sale. Jackson was waiting for Bennett on the porch, and James was inside the house. All three waited in the living room for approximately ten minutes, at which time appellant William Stanfield arrived. Stanfield and Bennett remained there while James and Jackson went to a bedroom out of their hearing. When the two returned, James gave Jackson and Stanfield pistols. Jackson then said, "Let's go," or "Let's move it," and he and Bennett left. They drove to Baptist Memorial Hospital in downtown San Antonio where they were met by James and Stanfield, who had preceded them. Bennett asked Jackson why Stanfield and James were there, and he replied that they were acting as lookouts for the police.

Shortly thereafter, federal agents, posing as buyers, arrived and Bennett walked over to their car. Upon returning to her own car, she heard James tell Jackson that, "the contact had been made."

In response to one of the agent's requests for a sample, Jackson entered the hospital to obtain it from Frank Garcia, who had arrived in a separate car driven by appellant Antonio Vasquez. Jackson and Bennett delivered the sample, but a slight delay ensued when Garcia insisted that the sale take place inside the hospital while the agent refused to deal except in the parking lot. Garcia went back to his car, and Vasquez began to drive away from the hospital. He was driving very slowly, however, and the agent was able to stop the car in the middle of the street[1] and persuade Gar-

---

1. There is a conflict in the evidence as to whether the car stopped before or after the agent moved toward it.

cia to make the sale. Carmen Jaramillo, a passenger, requested Vasquez to pull into the parking lot, which he did. He then got out of the car, went over a small abutment and began looking up and down the street. Garcia and the agent finalized their deal, and as the agent raised the government car's trunk to "get the money," James, Stanfield, Vasquez, Jackson, Garcia, and Jaramillo were arrested. After a jury trial, James and Stanfield were found guilty of violating 21 U.S.C. § 846 by conspiracy to possess with intent to distribute approximately ten ounces of heroin, and of aiding and abetting such offense, in violation of 18 U.S.C. § 2. Appellant Vasquez was acquitted of the conspiracy count but convicted of aiding and abetting. We affirm the convictions of all three appellants.

## I.

■ Appellants James and Stanfield argue that the court erred in permitting Bennett to repeat Jackson's statement to her that they were acting as lookouts for the police. We hold that the statement, although hearsay, was properly admitted as the declaration of a co-conspirator made during the course of the conspiracy and in furtherance of it.

■ Of course, in order for a statement made out of the presence of the defendant to be admissible under this exception, there must be proof *aliunde* of the existence of the conspiracy and of the defendant's connection with it. Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680 (1942), Montford v. United States, 200 F.2d 759, 760 (5th Cir. 1952). That requirement was clearly satisfied in this case. The government introduced uncontradicted evidence that Jackson arranged the pre-sale rendezvous at James' house, at which time James gave pistols to Jackson and Stanfield after conferring with Jackson; that James and Stanfield ar-

rived at the location for the deal prior to Jackson; that James told Jackson that "the contact" had been made; and that a loaded pistol was found on the floorboard of the car driven by James and Stanfield. Further, several government agents testified that after their arrival on the scene but before the arrest, James and Stanfield spent their time walking around the area, constantly looking around, as if "they had muscle spasms or something in their neck," according to one witness. They interrupted this activity on several occasions to converse with Bennett or Jackson, both of whom were attempting to finalize the transaction.

■ The trial judge has substantial discretion in determining whether there is adequate independent evidence of a conspiracy. Such evidence need only be credible and sufficient to support a finding of a joint undertaking;[2] the conspiracy's existence need not be proved beyond a reasonable doubt.[3] We think it plain that the trial judge here was correct in finding that adequate independent evidence had been presented to establish the existence of the conspiracy.

■ But in order to be admissible against one not present when the statement was made, it must have been made "in furtherance of the conspiracy." Although this phrase has a talismanic ring to it, we must not apply the standard too strictly, lest we defeat the purpose of the exception. It is true, of course, that mere conversation between conspirators is not admissible under this exception. United States v. Birnbaum, 337 F.2d 490, 495 (2nd Cir. 1964). That is not what we have here, however. Jackson, of course, was unaware that Bennett was a government agent; he considered her a full-fledged partner in crime. She had not known of James' and Stanfield's involvement, and therefore had legitimate reasons to be suspicious of their pres-

**2.** United States v. Johnson, 467 F.2d 804, 807 (1st Cir. 1972).

**3.** United States v. Elliott, 437 F.2d 1253, 1255 (5th Cir. 1971); United States v. Martinez, 481 F.2d 214, 220–221 (5th Cir. 1973).

ence; Jackson was acting in the interests of the conspiracy by allaying these suspicions. The statement was made in furtherance of the conspiracy.[4]

## II.

■ Appellants argue that the trial judge erred by acting as a prosecutor and failing to maintain the requisite judicial impartiality. Specifically, they object to the judge's admonitions to counsel for appellant James. We conclude that although the judge may have been unnecessarily severe in his comments to counsel, his actions did not so prejudice the jury as to deprive appellants of a fair trial, and are therefore not reversible error.

Appellants complain of the following judicial interventions: the court instructed counsel to "proceed to the next question" after he had asked the same question, and been answered, three times; the court insisted that a certain street was "a minimum of fifteen feet" wide, while counsel wished to stipulate a width of twelve feet; he admonished counsel, "I don't want minutes between questions. Let's move along;" finally, when counsel asked permission to make an offer of proof, the judge replied, "You can do that in the Fifth Circuit properly. Do it in New Orleans, not here. . . I'm not going to let you clutter up this record any more. We are trying a very simple case, and you are trying to complicate it."

■■ As we have noted on many occasions, a federal trial judge is more than a moderator; in fulfilling his duty to see that the law is administered properly, he may question witnesses and comment on the evidence. Gomila v. United States, 146 F.2d 372 (5th Cir. 1944). He must be especially careful, however, given the great influence he exercises over the jurors, to intervene in a timely, non-

prejudicial manner. United States v. Jacquillon, 469 F.2d 380, 387 (5th Cir. 1972); United States v. DeLaughter, 453 F.2d 908 (5th Cir. 1972). Above all, he must maintain his impartiality, never giving the jury an impression of his feelings as to the accused's guilt or innocence.

■ The judge in this case very nearly violated this cardinal rule in telling James' attorney that he could, "do that in the Fifth Circuit properly. Do it in New Orleans, not here." To a mind moderately sophisticated in legal matters, this comment could readily be understood as meaning that the judge presumed that James would be convicted and would therefore appeal to this court. Three factors have persuaded us, however, that although the comment should not have been made, it does not constitute reversible error. First, we believe that a jury composed of laymen understood the statement to mean, "If your client is convicted and appeals, you can take up this matter with the Fifth Circuit." Second, we must remember that this dialogue occupied but a few seconds of a lengthy trial, and concerned a procedural question far removed from the substantive issues to be decided by the jury. In this context, it is appropriate to recall the warning of Justice Frankfurter:

> In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal appeal into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution. Johnson v. United States, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943).

Third, even if the jury was influenced by the judge's comments, we believe his

4. *See* Salazar v. United States, 405 F.2d 74 (9th Cir. 1968) (statement by co-conspirator to agent, waiting to purchase narcotics, that other co-conspirator was inside making preparations held admissible); United States v.

Hutchinson, 488 F.2d 484 (8th Cir. 1973) (statement by co-conspirator to agent that his source of cocaine was other co-conspirator held admissible).

curative instruction in his charge overcame any possible prejudicial effect, including any prejudice resulting from the criticism about cluttering up the record.[5]

Finally, we find no merit in any of appellants' other complaints of judicial intervention.

### III.

Appellants' next contention is that the trial court erred in refusing to permit counsel for James to recall government agent Robert J. Hale as his witness after the government rested its case. If this is not error, they argue that the judge erred in denying counsel permission to make an offer of proof as to what agent Hale would testify.

■■■■ A trial judge has broad discretion in controlling the extent of direct and cross-examination. Curtis Publishing Co. v. Butts, 351 F.2d 702, 715 (5th Cir. 1965) aff'd 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1965); Roberson v. United States, 249 F.2d 737, 742 (5th Cir. 1957). Here, agent Hale had already testified and been cross-examined extensively by James' counsel. It is true that a subsequent witness gave a slightly different account of the occurrences at the hospital, but there was no direct conflict between the testimony of the two men on any crucial point. Under these circumstances, the trial judge did not abuse his discretion in refusing to permit recall of Hale for further cross-examination; just as clearly, James' counsel cannot circumvent this ruling by claiming a right to call Hale as his own witness for questioning on this point of limited significance.

■■■ The judge erred in refusing to allow James' counsel to make an offer of proof. Although there is no rule of criminal procedure analogous to Rule 43(c) of the Federal Rules of Civil Procedure, counsel should nevertheless be permitted to demonstrate what he intends to prove in order that the appellate court may pass most intelligently on the challenged ruling of the trial court. The trial judge was simply wrong when he told counsel he could make his offer of proof on appeal; clearly, the trial court is the proper place for such an offer. Pennsylvania Lumbermens Mutual Fire Insurance Co. v. Nicholas, 253 F.2d 504, 507 (5th Cir. 1958).

Nevertheless, we are convinced that the error in the present case was harmless. The discrepancy which James' counsel wished to explore was simply that while agent Overstreet testified that James had left the immediate area some time after his arrival, agent Hale, who had not been asked about James' movements, had said nothing about them. Whether he left or not, there is no dispute that he returned some time prior to the arrest. In light of the evidence connecting James with the transaction, we cannot agree that the court's refusal to let counsel explore this small point constitutes reversible error.

### IV.

Finally, appellants urge that the trial court should have granted their motions for acquittal because of the insufficiency of the evidence.

■■■■ The standard to be applied by a jury in a criminal case is the same regardless of the nature of the evidence: the defendant must be proved guilty beyond a reasonable doubt. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1955). The standard to be applied by the court on a motion for acquittal is similar. Whether the evi-

---

**5.** The judge charged: "It is the duty of counsel for both sides to present by way of objections, motions and similar procedural [sic] matters of law affecting the case for the court's consideration and determination. Also, all such matters of law and their presentation by counsel must be entirely disregarded by you. They are matters of procedure which you have no concern with, neither presentation of such matters by counsel for either side nor any arguments made in support or in opposition to any of them, or remarks or rulings of the court thereon have any bearing upon your deliberations and you must put all such matters out of your mind. They should not influence you in any way, shape or form in arriving at a verdict."

dence is direct or circumstantial, the question of the defendant's guilt is for the jury to decide unless the judge, viewing the evidence in the light most favorable to the government, concludes that the jury would necessarily have to have a reasonable doubt; if he so concludes, he must grant the motion for acquittal. United States v. Warner, 441 F.2d 821 (5th Cir. 1971). See 2 C. Wright, Federal Practice and Procedure, § 467 at 259. Conversely, if a jury might have a reasonable doubt or might not have one, the judge must deny the motion and allow the jury to make the decision. Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229 (1947). ▮ To be found guilty either as an aider and abettor or as a conspirator, defendants must be found to have participated in the sale of the heroin as something they wished to bring about, and must have actively sought to make their goal succeed. Merely being a knowing spectator is insufficient. United States v. Martinez, 479 F.2d 824, 829 (1st Cir. 1973). See United States v. Garguilo, 310 F.2d 249, 254 (2nd Cir. 1962). And of course, in order to meet its burden of presenting evidence from which a jury might properly find these acts to have been proved beyond a reasonable doubt, the government must present more than a mere scintilla of evidence; it must produce evidence which, if believed, affords a substantial basis in fact from which the defendant's guilt can be inferred. United States v. Roberts, 465 F.2d 1373 (6th Cir. 1972); United States v. Martin, 375 F.2d 956 (6th Cir. 1967).

▮ Applying these tests to the present case, we hold that the trial judge was correct in overruling James' and Stanfield's motions for acquittal. There was ample evidence which, if believed, proved that, far from being mere knowing spectators, the two had deliberately

gone to the hospital to act as armed lookouts. Whether that evidence was to be believed was for the jury to decide; the judge acted properly in refusing to take that decision away from it.

The majority feels that denial of Vasquez's motion was proper also. I, however, reach a different conclusion as to him. The government's relevant evidence against him, if believed, proved only that he parked the car in which Garcia and Jaramillo were riding, exited when he observed the drugs, stepped over an abutment and looked up and down the street.[6] The arrests were made almost immediately after Vasquez went over the abutment; he was carrying a pistol and ammunition at the time of his arrest.

This evidence proves no more than that Vasquez was, at most, a knowing spectator. There is simply no substantial factual basis from which the jury could properly infer that Vasquez actively sought to make the sale succeed. The evidence is quite similar to that held insufficient in Orozco-Vasquez v. United States, 344 F.2d 827 (9th Cir. 1965). There, the defendant was shown to have driven his girlfriend from her house to the scene of the sale, waited in the car, and driven her back home. See also United States v. Pratt, 429 F.2d 690 (3rd Cir. 1970) where the court held insufficient to support a conviction of aiding and abetting the sale of heroin, evidence that the defendant spoke with the seller, peered in through the windshield of a car at the federal agent posing as the buyer, spoke to the seller again, got in the car and was present when the sale was made, at which time the seller told the agent that the defendant had "put" four dollars toward the purchase of the heroin.

For the above reasons, the convictions of appellants are

Affirmed.

---

6. The government contends that he was acting as a lookout, while he testified that he wanted to leave the hospital area, having realized that a narcotics sale was about to take place, and was looking for a bus. The government's evidence as to his activity was contradictory: agent Wood testified that he "was not concerned with what was transpiring behind him," while agent Hale testified that, "[h]e looked back into the parking lot numerous times, and on one occasion he stared directly at Agent Wood and myself for a couple of minutes."

CLARK, Circuit Judge:

Judge Thornberry and I are convinced that the evidence adduced as to Vasquez's activities was sufficient to support the jury's verdict. Because our difference is so largely factual, we have extracted from the record the following summary of Vasquez's participation in this transaction, viewed in a light most favorable to that verdict.

Prior to these 1973 events, Vasquez had known Garcia for 8 or 9 years. On the afternoon of November 3rd, Garcia sought out Vasquez at a pool game in a bar and asked to borrow his gun. Vasquez testified that Garcia wanted the gun when he went to the hospital room of an injured black man, as Garcia thought he was wrongfully suspected by the wounded man's friends of responsibility for his wounds and needed the gun for protection until he could make his explanation. Vasquez stated he refused the loan but offered to arm himself and accompany Garcia. When Vasquez got to Garcia's car outside the bar he saw that Carmen Jaramillo, a female he had met before, was waiting in the car. The three then went to Vasquez's home and Vasquez armed himself. Garcia, Jaramillo and Vasquez next went to a small parking lot at the side of the hospital. (Vasquez claimed Garcia drove the car to this point.) Upon their arrival, Vasquez, Garcia and Jaramillo went into the hospital together. Inside the hospital Garcia left Vasquez and Jaramillo for a short time and met with Jackson and Bennett. (Vasquez stated that although his mission was to protect Garcia, he and Jaramillo sat in the waiting room and Garcia went on alone to his "dangerous" meeting.) While Vasquez was still inside the hospital, Jackson and Bennett exited the hospital, conferred with the government undercover agent, Castro, and another participant in the heroin exchange, reentered the hospital and again conferred with Garcia. Jackson, Bennett and Garcia then left the hospital together for a second meeting with Castro. Garcia entered the hospital a second time and a few minutes later walked out of the hospital right behind Jaramillo and Vasquez. James, Stanfield and Jackson now were also outside the hospital a short distance away and they were engaged in a conversation. Garcia left Jaramillo and Vasquez, met with Jackson briefly, and then rejoined Jaramillo and Vasquez. (Vasquez testified that he was very impatient to leave because he and his wife were going to a wedding that evening. He further stated that while inside the hospital Garcia had given him the keys to the car and told him to drive it back to the bar so he could pick up his own auto and get on to the wedding.)

After these comings and goings Vasquez, Garcia and Jaramillo got back into Garcia's car, with Vasquez at the wheel, and proceeded slowly from the doctor's parking lot, where the car first had been improperly parked, to a brief stop in the inner traffic lane of the street just outside the hospital's public parking lot. (Vasquez testified that he really was on his way back to pick up his car at the bar, but agreed to a detour "for just one beer," and that he had stopped the car in the middle of the street because Castro had hailed them down at that point.) When Vasquez made this stop, a government vehicle operated by agent Castro was just inside the parking lot, and while the two vehicles were thus stopped, Castro came to the passenger side of Garcia's car and, in the presence of Vasquez, asked Jaramillo and Garcia if they had the "dope". A discussion followed as to whether the money or the heroin would be first shown. Vasquez admitted he heard and understood this conversation. Vasquez then drove Garcia's car into the hospital parking lot and parked it two spaces away from where Castro had parked the government vehicle. (He claimed he drove on to this point solely to get Garcia's car out of traffic.) Vasquez remained behind the steering wheel of Garcia's car while Garcia went to Castro's vehicle and brought Castro back to the Garcia car to see the heroin. When Castro and Garcia returned to Garcia's car, Jaramillo removed a brown bag containing the heroin from her purse and gave it to Garcia,

who showed its contents to agent Castro. Vasquez was the only other occupant of Garcia's vehicle when this transpired. When the bag was handed to Castro, Vasquez got out of the car, walked to the front of the vehicle, squatted down and looked to both sides. He then walked to an abutment at the edge of the parking lot, looked both ways along the street and back into the parking lot. At this time, agents closed in and arrested those present. When Vasquez was apprehended he had his gun, loaded with 6 live rounds of ammunition, tucked in his waist band and another 9 rounds of ammunition in his pocket.

While Vasquez's conduct may have been a far-fetched but, as he contended, unknowing effort to assist his friend Garcia in a hazardous confrontation, a reasonably-minded jury could also have concluded that his activities were consistent with those of a bodyguard-lookout, constantly in the thick of things, who intended to aid and abet the commission of a crime by protecting Garcia's interests in an illicit narcotics transaction. The court correctly submitted this issue to the jury and their resolution of it is due to be affirmed. *See* United States v. Jimenez, 496 F.2d 288 (5th Cir. 1974).