[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 31, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-14278
Non-Argument Calendar

_____

D. C. Docket No. 05-00017-CR-003-HL-6

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

W. DEXTER HARRISON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(August 31, 2007)**

Before BIRCH, BLACK and MARCUS, Circuit Judges.

PER CURIAM:

W. Dexter Harrison appeals his convictions and sentences for conspiring to

commit arson and mail fraud, mail fraud, arson, and making misleading statements, all in violation of 18 U.S.C. §§ 371, 844(i), 1341, and 1512(b)(3). On appeal, Harrison first argues that the district court abused its discretion by admitting the testimony of two witnesses as non-hearsay statements by a co-conspirator. Second, Harrison argues that the district court abused its discretion by admitting certain testimony as a non-hearsay prior consistent statement. Finally, Harrison argues that his sentence of a total of 180 months of imprisonment was unreasonable. We AFFIRM.

## I. BACKGROUND

In 2005, Harrison, with co-defendant Martin Harrell, was indicted in a 13-count superceding indictment. In the indictment, Harrison and Harrell were jointly charged with: (1) conspiring to commit arson and mail fraud, in violation of 18 U.S.C. §§ 371, 844(i), and 1341 (Count 5); (2) mail fraud, in violation of 18 U.S.C. § 1341 (Count 6); and (3) arson, in violation of 18 U.S.C. §§ 844(i), 2 (Count 7). The indictment also separately charged Harrison with making misleading statements, in violation of 18 U.S.C. § 1512(b)(3) (Count 13).[1]

Prior to trial, Harrison filed a motion in limine to prohibit the government from entering into evidence statements allegedly made by Harrell to a third person

---

[1] The remaining counts in the indictment are not relevant to this appeal.

2

essentially confessing to the arson. Harrell also filed a motion in limine to prevent the government from, among other things, discussing at trial any communication between Harrell and his wife Julie Harrell ("Julie"), arguing that such communications were protected by the marital privilege.

At a pre-trial hearing, and later in writing, the district court granted Harrison's motion in part, prohibiting the government from mentioning at trial incriminating statements Harrell made to a third person until after it had held a hearing to determine whether they were admissible as non-hearsay co-conspirator statements. As to Harrell's motion, the government agreed not to ask Julie about any communications between Harrell and herself, and limit their examination to things she observed. The defense apparently accepted this agreement, and the court apparently took no action on this aspect of the motion.

Harrison and Harrell proceeded to trial on Counts 5-7 and 13, as well as others that are not relevant to this appeal. At trial, three witnesses testified that they had been guests at the Ramada Inn in Donalsonville, Georgia, ("the motel") on 7 January 2002, when they were awoken from sleep by the exhaust fans in the motel's bathrooms blowing off the walls. They testified variously that heat, "red reflections," and "black smutty smoke" came out of the holes left by the fans, and all testified that they determined the motel was on fire and left their rooms. R9 at

3

6, 10-11, 14-15. One witness testified that he suffered smoke inhalation that required treatment.

Stella Williams testified that she was working the night shift at the motel on the night of the fire. While outside smoking, Williams saw a white man wearing jeans, work boots, a tough fabric "Carhart" jacket, and baseball hat "either trying to enter or come out of" the ground floor utility hallway. Id. at 21. The man had a "pump-up sprayer." Id. She also testified that the door to the utility hallway and the mechanical room was locked with a metal key.

Williams testified that in the next few minutes she called 911, heard an explosion, was told by a guest that the motel was on fire, and called all of the guests to get them out of the motel. She testified that other than the guest who suffered smoke inhalation, they all escaped safely. She testified that she saw a pickup truck leave the parking lot.

Three law enforcement agents testified about the investigation of the fire. The agents essentially explained that the evidence found at the scene, including various plastic containers containing a red-dyed fuel and some that originally held "some type of farm chemical," as well as a pump sprayer, showed that the fire was intentionally started using a mixture of gasoline and diesel fuel. R9 at 97. Two of the agents also testified that they discovered similar plastic containers and

chemicals in a shed rented by Harrell and at his residence. They further testified

that the utility hallway might have been accessed using the motel master keys.

Michael Murphy, an investigator for the Georgia Bureau of Investigations,

testified that in February 2002 he received an anonymous tip that led him to

question Harrell in connection with the fire. Harrell told Investigator Murphy that

he "didn't know anything about a motel fire, [but] that he might have some

information that might be helpful." R10 at 47. Investigator Murphy testified that

Harrell then stated that:

> about two or three weeks before Christmas, . . . 2001, two individuals
> came to his barn, and one of the individual[s'] names was either Tracy
> or Stacy Williams. . . . Williams . . . asked him did he know an
> individual by the name of Russ Presley. [Williams] stated that . . .
> Presley was currently at the . . . motel . . . . [Williams] stated that . . .
> Presley was involved in something, was in some kind of trouble, and
> was afraid for his life, and that he wanted a thousand dollars, and that
> he wanted to talk to . . . Harrell. . . . [Harrell told Williams] he was not
> going to give [Presley] a thousand dollars, but he would go help him.

Id. at 47-48.

Harrell told Investigator Murphy that he later went with Williams to the

motel, where Williams used a key to enter the first and second floor utility

hallways. They did not find Presley, though they did find "two pallets . . . as if

someone had been sleeping on them." Id. at 50. Williams then told Harrell that

"[Presley] killed them both and took what drugs they had left." Id. Williams told

5

Harrell that his mother worked in the motel and let him sleep in the utility hallway. Harrell then gave Williams a ride to a gas station where he dropped him off. Harrell did not indicate whether he had reported the alleged murders to law enforcement.

Harrell also told Investigator Murphy that some tools and plastic containers had been missing from his barn a few days after Williams visited him. Investigator Murphy testified that he took Harrell's fingerprints and Harrell stated that they might find his fingerprints on the walls inside the utility hallway at the motel. Investigator Murphy further testified that two days later, Harrell called him and he went to visit Harrell at his rented shed. Investigator Murphy testified that Harrell was wearing a baseball cap, jeans, work boots, and a "large farm type jacket." Id. at 61. He told Investigator Murphy he had found that he was missing a pump sprayer.

When Investigator Murphy asked Harrell about his relationship with Harrison, Harrell stated that they were neighbors and that he had sold some land to Harrison. When Investigator Murphy told Harrell that Harrison owned the motel, Harrell did not react. Later, Harrell also told Investigator Murphy that he went to the same church as Harrison and stated that Harrison "was a wealthy man that lived in [a] mansion that wasn't going to give him any money, and he damn sure wasn't

6

going to give him any money to burn a motel." Id. at 72-73.

Murphy also testified to interviewing Harrison, who stated that he was the sole owner of the motel and the president of Harrison and Associates. Harrison further stated that he had never increased the insurance on the motel after it was built. Harrison told Murphy that the motel was for sale for $1.3 million, and that it was subject to a $1.1 million mortgage. Harrison also stated that business at the motel was better than it had ever been.

Stella Williams also testified that her stepson, Stacy Williams, had died on 10 January 2002, of an apparent self-inflicted gunshot wound. She testified that he had been "severely handicapped" in a serious car accident, that he had surgery twice, the second time only "two or three months before the fire," and that he always used crutches, could not lift heavy objects, and "had to have help doing everything." R9 at 27-28. She also testified that he was addicted to prescription pain medication. Williams testified that she did not know Harrell, and that she did not think her step-son knew someone named Russ Presley.

A surgeon testified regarding the surgery he had performed on Stella Williams's step-son, Stacy, noting that he had been in the hospital until 29 November 2001, after his second surgery. In addition, two physical therapists testified that: (1) Stacy had a "significant limp" when he walked due to his

7

accident; and (2) following his second surgery he was "strictly on crutches" and was allowed to walk "no more than 75 feet." R11 at 150-54, 158-62.

Williams testified that she had never given the metal key to the utility hallway to her step-son, and that she had never seen him with the key. She also stated that during the period from October 2001 until the fire she was not aware of any vagrants or homeless people sleeping in the utility hallway or otherwise hanging around the motel. She also never saw any evidence in the utility hallway of someone sleeping there. Finally, she testified that the utility hallway was only two or three feet wide, with unfinished boards for a floor, and doubted that it would have been possible for anyone to live there.

Julie, Harrell's wife, testified that Harrison was a close family friend that Harrell had introduced her to when they started dating and that the family referred to him as "Uncle Dexter." She stated that he attended their wedding, came to family birthday parties and cookouts, and even went to the same church she attended. She understood that Harrison had gone to school with Harrell's father, her father-in-law.

The government then turned Julie's attention to the fall of 2001, and she testified that on the evening of 18 October 2001, Harrell took Dennis Weaver, who worked on the farm with him, out to dinner. Harrell left with Julie's pistol. While

8

Weaver was waiting for Harrell, Julie asked Weaver where they were going, and he said he did not know. Julie testified that the men did not return until 11:00 p.m. that night.

"[T]he next day or the next . . . week," Weaver told Julie where they had gone. R10 at 137-38. Julie testified that what he told her made her pay close attention to the telephone calls that Harrell received from Harrison. When she would answer Harrison's calls, she would either give the phone to Harrell or take a message. Although "[m]ost of the time" when Harrell talked on the phone he would talk in the house, on "[s]everal occasions" he took Harrison's calls on the cordless phone and went outside to the carport. Id. at 139. Asked to estimate how many times Harrison called in this way, Julie replied: "I would say maybe five." Id. She was not aware of any business dealings that the two men had at that time.

Julie next testified that on 6 January 2002, she went to her sister-in-law's house to pick up her children and Harrell stayed at home. That evening, Harrell laid out his work clothes and put a flashlight, with brand new batteries, with his clothes–something he had never done before. Julie lay in bed that night only pretending to sleep. At about 11:00 p.m., the phone rang once, and Harrell got up and left in his Explorer. After Harrell was gone, Julie dialed *69 on her phone to see who had called before Harrell left, but it was an unknown number. Finally,

9

Harrell came back at "about eight minutes to three," driving his father's red pickup truck.  Id. at 143.

Julie testified that she waited outside the kitchen door for Harrell, and that she heard him start their washing machine, which was in the carport, before he came to the house wearing only his boxer shorts and "reek[ing] of diesel."  Id. at 144.  The next morning, Julie observed "a black ring around the tub" in the washing machine that she recognized, from prior experiences, was caused by diesel.  Id. at 144-45.  That afternoon, Harrell brought the Explorer back, and Julie noticed that, although it had been raining the night before, the vehicle was clean.

On cross-examination by Harrell's counsel, Julie admitted keeping a diary and making notes concerning the events in question.  Although the diary itself was not in evidence, Harrell's counsel pointed out that an entry dated 12/29 was followed by an entry dated 12/5.  Julie stated that she tried to write things down on the day they happened, but did not always do so.  She could not explain why the 12/29 entry came before the 12/5 entry, but did suggest she may have been trying to use up paper.  She rejected Harrell's counsel's suggestion that she had "recreated" any entries after the fact.  Id. at 171-72.  Harrell's counsel asked Julie when she had written an entry dated 6 January 2002, but she could not remember.  She did state, however, that it "would have been within a day or two."  Id. at 173.

10

Harrell's counsel noted that this was the last entry in the diary, and came on the Sunday before the fire at the hotel. Counsel then read from the diary:

> I haven't said a word, went to . . . Ruby Tuesday's to eat and then grocery shopping, return[ed] at 4:45, Alicia calls and wants me to come get the boys. . . . [Harrison] called, so he [Harrell] goes to see him. We get home at 6:30, and he – [Harrell] returns at 6:50, said the horse was out. Laid clothes out before Garrett and I went to bed at 9:30. Woke me at 10:30, said his daddy called and had horse in the road. He returned from coming home, Arline direction, at 2:35 in the morning in the red truck. Came home and put his clothes in the washing machine, had strong diesel smell to him and clothes.

Id. at 173-75. Julie admitted to writing that, but could not remember when she had written it.

At a brief sidebar out of the presence of the jury, the government argued that, by asking Julie about the diary notes reflecting the communications between herself and Harrell on the night before the fire recorded in her diary, the defense had waived the marital privilege and requested permission to question her on redirect about those issues. After a recess, the court found that Harrell's counsel had waived the privilege with respect to the communications raised during the cross-examination, and granted the government's request.

In response to the court's ruling, Harrison's counsel objected, on the basis of hearsay, to the admission into evidence of any communication by Harrell regarding the fact that he was going to meet Harrison. Further, Harrison's counsel moved "to

11

preclude [Julie] from testifying as to anything that Mr. Harrell may have told her about Dexter Harrison or going to [Harrison's]." Id. at 219. The court overruled that motion.

After the jury returned, Julie testified on redirect that the 6 January 2002, entry was the last one in her diary because she had taken them to her friends for safe keeping after Harrell had asked her if she had ever documented anything and she was afraid he would find them. She further testified that when she went to pick up her children from her sister-in-law's house on 6 January 2002, Harrell did not go with her because he said he "had a meeting with [Harrison] over a land deal." Id. at 223. She further testified that after the phone rang later that night, Harrell had "leaned down and told [her] that a tree had [fallen] across the fence, . . . that his dad had called and said that [Harrell's horse] was out in the road, and that he was going to get her in." Id. at 224. Still later, after Harrell came home again, she asked him why he had been out so long and he said he "had gotten bogged down" and had walked back to his father's house to get his truck. Id. at 225. Finally, he had told her that "it would be in [her] best interest to go to bed and forget all that had happened if [she] did not want to wake up dead one morning." Id.

Thomas Garnier, an agent in the financial investigative service division of the Bureau of Alcohol, Tobacco, and Firearms, testified that a review of Harrison

and Associates' records showed that the financing of the motel "almost quadrupled" the company's liabilities, was its single largest liability, caused the company to have a negative cash flow, annually pay thousands of dollars in overdraft charges, and created large fluctuations in its annual income. R11 at 186-89, 191-93, 199. Finally, Agent Garnier testified that Harrison and Associates lost $92,000 in 1998, the first year of operating the motel, $137,000 in 1999, $105,000 in 2000, and $118,000 in 2001.

Charles Davis, the senior vice-president of the Capital City Bank, in Cairo, Georgia, testified that the bank had loaned Harrison over one million dollars to build the motel, and that it was not generating enough money to cover the monthly payments on the loan. He also testified that during a six year period, the monthly payment was paid between 30 and 59 days late four times, and was paid between 10 and 29 days late 48 times. Davis also testified that Harrison had acted as a personal guarantor on the loan.

Emmet Brock, Harrison's accountant, testified that in 1998, Harrison and Associates had a net income of $83,193, and that the motel "was a net loss of $92,178" that year. R12 at 64. In 1999, the company's "overall profit was $78,650," and the motel was a $137,364 loss. Id. In 2000, the company turned $20,112 in profit, and the motel was a loss of $104,707. In 2001, the company's

13

profit was $57,724, and the motel was a loss of $117,502. Thus, he testified the "the construction segment of the business" made the payments on the motel's note. Id. at 67. On redirected examination, after being asked on cross-examination about tax savings due to the losses incurred by the motel, Brock testified that he had not included tax savings in his annual financial statements for the company. Further, he did recall one time when Harrison pointed out that, even though the motel was losing money, it was saving them on taxes, and Brock replied, "yes, . . . but you're still losing money." Id. at 77.

Emo Lic T. Jones, the officer manager and secretary-treasurer of Harrison and Associates, testified that she "remember[ed] something" about Harrison and Harrell having a lunch meeting the day after the fire, but she did not know what they had spoken about. Id. at 175-76.

Craig Presley ("Craig"), who had been friends with Harrell since childhood, testified that Russ Presley was his brother, and that Harrell had called him in February 2002 "wanting to know where [Presley] was at, want[ing] to know if he was in jail or not." R13 at 33. He testified that Harrell had not spoken to him for four or five years prior to the phone call. Craig told Harrell that Presley was living in the area with his grandfather.

Before Dennis Weaver testified, the court held a hearing, in accordance with

14

United States v. James, 510 F.2d 546 (5th Cir. 1975) (en banc), to determine whether Weaver could testify regarding statements made to him by Harrell under the co-conspirator statement provision of Fed. R. Evid. 801(d)(2)(E).  First, the government summarized much of the testimony given and evidence submitted to argue that it had established the existence of a conspiracy between Harrison and Harrell.

Among other things, the government argued that the evidence showed that: (1) an arson occurred at the motel; (2) the arson was an inside job – there was no forced entry;  (3) the motel was Harrison's only asset that was losing money; (4) only Harrison had a financial motive to burn down the motel; (5) Harrell returned from his trip out that night smelling of diesel fuel and threatened his wife, Julie, to forget what she had seen; (6) Harrison and Harrell were friends and Harrell had no obvious motive to harm Harrison, but they downplayed and misrepresented their relationship during the investigation; (7) Harrison and Harrell were in contact a number of times preceding the fire, and Harrell hid the nature of their conversation from Julie; (8) Harrell met with Harrison the evening before the fire and went out to lunch with him afterwards; (9) Harrell admitted he had been in the utility hallway; (10) Harrell's statement to the police was necessarily a fabrication because he did not indicate that Stacy Williams was disabled, and because

Williams could not have climbed the stairs as Harrell claimed; (11) Harrell's knowledge of Stella and Stacy Williams showed he had access to the motel from an insider, such as Harrison; and (12) Harrell checked up on Presley to make sure he was not in prison and was in the area.

The government also alleged that Weaver would testify that Harrell: (1) offered to pay him to assist him while he burned the motel; (2) told him Harrison owned the motel and that it was a losing $10,000 a month; (3) told him Harrison would be providing him with a key to the utility hallway and he would burn it with diesel fuel; and (3) told him he was working on a cover story involving Stacy Williams.

In response, the defense argued that the government had failed to show, by a preponderance of the evidence, that a conspiracy existed or that Harrison was a member of the conspiracy. In this regard, the defense argued, among other things, that all of the government's evidence of the conspiracy was based on inference.

The court found that the government had shown with a preponderance of the evidence that a conspiracy existed and that Harrison and Harrell were members of the conspiracy. It further found that the government had shown that Harrell's statements to Weaver were made in furtherance of the conspiracy. Accordingly, the court found that Weaver's testimony was admissible.

Thereafter, Weaver, who worked for Harrell as a farmhand, testified that Harrell stored up to a thousand gallons of red-dyed diesel on his farm. He also testified that while working for Harrell he had seen him use a mixture of diesel and gasoline to burn brush piles.

Weaver testified that, while he worked for Harrell part-time, he was attending Bainbridge college full-time and that Julie was also attending that college and he would see her on campus. Weaver testified that he had "a number of conversations" with Julie in the fall of 2001 and into 2002. R14 at 28. In October 2001, approximately 12-13 weeks before the fire, Harrell invited Weaver to dinner to discuss a "business opportunity." Id. at 29-30.

After they had eaten, Harrell drove them to the motel. When they got there, Harrell told Weaver he had been asked to "set the hotel on fire." Id. at 31. Using a key that he said the owner had given him, Harrell took Weaver into the first floor utility hallway. Harrell told Weaver that the owner wanted the motel burned because it was losing $10,000 a month.

Harrell told Weaver he intended to apply diesel and gasoline to the walls and ceiling with a sprayer and he wanted Weaver to act as a lookout. On the way back to the car, Harrell told Weaver he would pay him $1,000 for his help. On the way home from the motel, Harrell told Weaver that Harrison owned the motel.

17

Weaver tried to talk Harrell out of doing it, arguing that "there [was] no guarantee that everybody would make it out of the hotel, and he said that he had thought about that, but that was just one of the things he'd have to deal with." Id. at 34-35. Harrell told Weaver that he had planned to burn the building over Christmas, but had moved the date back after Harrison told him that the motel would be nearly full at that time. Harrell told Weaver to lie to Julie about their trip.

Weaver testified that Harrell twice asked him if he would reconsider his decision, but Weaver refused. He testified that he spoke to Harrell in person the day after the fire, and that Harrell told him he "got a little careless," almost got caught in the fire, was seen by someone, and left fingerprints behind. Id. at 38. Harrell also told Weaver that he was going to blame the fire on Stacy Williams, who he said had mental problems, and Russ Presley, who had a drug problem.

Weaver also testified that he had conversations with Julie both in the days leading up to the arson and after the arson occurred, when he and Julie had returned to college for the Spring 2002 semester. In this regard, the government generally asked Weaver if Julie had told him about her husband, Harrell, speaking to Harrison on the phone. Before Weaver answered, Harrell's counsel objected, arguing that the answer would require hearsay. The government argued, however,

18

that it was being "offered as a prior consistent statement after Julie['s] testimony [had] been attacked as a recent fabrication." Id. After the court looked at Federal Rule of Evidence 801(d)(1)(B) and heard brief argument, it overruled the initial objection. The government then asked the question again, and Weaver stated that Julie told him that Harrell "had . . . been receiving numerous phone calls from [Harrison] each night leading up to the arson." Id. at 43. At this, Harrison's counsel objected, arguing that Julie had not said that in her testimony, that it therefore was not consistent, and was hearsay. The court overruled the objection.

After the government rested its case, Harrison submitted evidence and presented eight witnesses in his defense. Testifying in his own defense, Harrison denied all the charges. Further, he stated that he did not recall speaking to Harrell or meeting with him the day before the fire, although he admitted that he and Harrell were working on a land deal around that time. Harrell did not testify. Finally, the government presented a brief rebuttal.

After deliberating, the jury found Harrison guilty of all of the charges against him.

The Presentence Investigation Report ("PSI") recounted the facts of the case, and noted that the hotel and its contents were insured in the amount of $1,505,270. The PSI grouped the counts of conviction into two groups for the purpose of

calculating Harrison's offense level.  Group 1 consisted of conspiracy to commit arson, arson, and making misleading statements, and Group 2 consisted of conspiracy to commit mail fraud, mail fraud, and misleading statements.  After calculating the total offense levels for each group, which included enhancements for obstruction of justice, the PSI applied a multiple count adjustment under U.S.S.G. § 3D1.4 that added two levels to the higher of the two group's total offense levels, resulting in a total offense level of 28 as to all of the offenses of conviction.

The PSI noted no convictions, arrests, or other criminal conduct, resulting in zero criminal history points, and a criminal history category of I.

With an offense level of 28 and a criminal history of I, the PSI calculated an advisory guideline sentencing range of 78 to 97 months of imprisonment.  The PSI noted that the statutory maximum terms of imprisonment were: (1) as to Count 5, 5 years; (2) as to Count 6, 20 years; (3) as to Count 7, 40 years; and (4) as to Count 13, 10 years.  The PSI also noted that Harrison was subject to a statutory mandatory minimum sentence of 7 years (or 84 months) of imprisonment as to Count 7.  The PSI calculated a guideline sentence of supervised release of 2-3 years, as to Counts 5, 6, and 13, and 3-5 years as to Count 7.  The fine range was $12,500 to $125,000.  Finally, pursuant to 18 U.S.C. § 3663(a) and U.S.S.G. §

20

5E1.1, restitution was required.

The government raised six objections to the PSI, including essentially arguing that the court should vary upwards under United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005). Meanwhile, Harrison only objected to the loss amount and to a statement in the fact section that alleged that more than one witness saw Harrell leave the scene of the arson.

At the sentencing hearing, Harrison waived any objections to the PSI and argued that the court should reject all of the government's objections. The court then heard argument on all of the government's objections, the government called Stella Williams to testify, and Harrison called five witnesses in mitigation.

After Harrison declined to address the court in allocution, the court stated that it had considered the advisory guidelines and "determined that the advisory sentencing range [was] 84 to 97 months, considering an offense level of 28 and a criminal history category of one." R17 at 81, 83-84. The court then stated:

> The Court is of the opinion that a sentence outside the advisory guidelines range, however, is appropriate in this case upon considering the nature and the circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide for just punishment for the offense, as well as to afford adequate deterren[ce] to criminal conduct and to protect the public from further crimes from the defendant.
>
> In all of this conversation and hair splitting about the provisions of the

21

Guidelines, the Court simply cannot ignore the fact that the defendant has been found guilty of deliberately and intentionally setting or causing to be set a fire to the motel in question at a time when it was occupied by at least 16 people, some of whom were of tender age, some of whom may have been disabled, at a time when all of those people likely were in bed and under circumstances which very likely could have caused a loss of life or very serious bodily injury to many, many people.

If, as [Harrison's counsel] urges, the Guidelines take those factors into consideration and come up with a range of 84 to 97 months, if that is true, then it is the opinion of this Court that that is an unreasonable application of fact to law, and the Court feels that that does not adequately address the circumstances in this case or the seriousness of what Mr. Harrison has been found guilty of doing.

Id. at 84-85.

The court then orally sentenced Harrison to 60 months of imprisonment as to Count 5, 180 months of imprisonment as to Count 6, 180 months of imprisonment as to Count 7, and 120 months of imprisonment as to Count 13, all to run concurrently, for a total sentence of 180 months. The court imposed a fine of $50,000 and a period of five years of supervised release. Finally, the court stated that "[t]he sentence as imposed is an appropriate sentence in this case, complies with the factors that are to be considered as set forth at 18 U.S.C. § 3353(a), and adequately addresses the totality of the circumstances." Id. at 87. When the court asked the parties if they had any objections, Harrison's counsel responded that he did not, other than to preserve his objection "to the upward departure." Id.

22

Thereafter, the court entered a written judgment in accordance with its oral pronouncement, and then later entered a separate order imposing restitution. Harrison timely appealed.

## II.  DISCUSSION

### A.  Co-conspirator Statements

First, Harrison argues that the district court erred by finding that Harrell's statements to Weaver were admissible as non-hearsay statements of a co-conspirator.  Specifically, he contends that the government failed to establish that a conspiracy existed.  In this regard, Harrison claims that the government's evidence was comprised of mostly inferences, and that the government's assertion that the motel was a financial drain on Harrison was "hotly disputed."  Appellant's Br. at 36.  Harrison also argues that, because Julie's testimony that Harrell said he was going to meet Harrison was inadmissible hearsay, it should not be included in the evidence of the conspiracy.  But, as discussed below, because we find that Julie's testimony in this regard was admissible, this argument is meritless.  Second, Harrison contends that the district court erred by permitting Julie to testify regarding Harrell's statement that he met with Harrison the day before the arson to discuss a land deal.  Among other things, he claims that Harrell's statement was not admissible as a co-conspirator statement because it was not made in the

23

furtherance of a conspiracy.[2]

We review the admission of evidence for abuse of discretion and will "overturn findings of fact only if clearly erroneous." United States v. Magluta, 418 F.3d 1166, 1177 (11th Cir. 2005), cert. denied, ___ U.S. ___, 126 S. Ct. 2966 (2006) (citation omitted). "A finding of fact is clearly erroneous when after reviewing the entire evidence the reviewing court is left with a definite and firm conviction that a mistake has been committed." United States v. Van Hemelryck, 945 F.2d 1493, 1498 n.3 (11th Cir. 1991) (quotations and citations omitted). "A district court's determination that a statement was made in furtherance of a conspiracy is a finding of fact subject to a clearly erroneous standard of review." United States v. Miles, 290 F.3d 1341, 1351 (11th Cir. 2002) (per curiam) (citation omitted). A failure by the district court to specifically determine whether the government had satisfied the requirements of Rule 801(d)(2)(E) "is harmless error if the record demonstrates admissibility." United States v. Fernandez, 797 F.2d 943, 946 (11th Cir. 1986) (citation omitted). Although it is possible that some of Harrison's objections with regard to this issue were not preserved, the standard of

---

[2] Finally, Harrison also asserts that this error prejudiced him because he testified that he did not meet Harrell the day before the fire, and this claim was the basis of Count 13. The jury, however, could have believed the opposite of Harrison's testimony. See United States v. Turner, 474 F.3d 1265, 1280 (11th Cir. 2007) ("the jury, hearing [the defendant's] words and seeing [his] demeanor, was entitled to disbelieve [his] testimony and, in fact, to believe the opposite of what [he] said" (quotations and citation omitted)). Further, because, as discussed below, this evidence was properly admitted, we need not consider the prejudice it caused.

24

review is not dispositive here, and we will review this issue as if fully preserved.

"A statement is not hearsay if . . . (2) . . . [it] is offered against a party and is . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E)." Fed. R. Evid. 801(d)(2)(E).

"For a declaration by one defendant to be admissible against other defendants under this [rule], the government must establish by a preponderance of the evidence: (1) that a conspiracy existed, (2) that the defendant and the declarant were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy." Van Hemelryck, 945 F.2d at 1497-98 (citations omitted). Although the preferred method of proving these requirements is in a hearing prior to the admission of the evidence, it is nevertheless within the court's discretion to admit the alleged co-conspirator statements subject to be proven during trial. Fernandez, 797 F.2d at 945 (citation omitted). "In determining the admissibility of co-conspirator statements, the trial court may consider both the co-conspirator's statements and independent external evidence." Magluta, 418 F.3d at 1178 (quotations and citation omitted).

"This circuit applies a liberal standard in determining whether a statement is made in furtherance of a conspiracy." Miles, 290 F.3d at 1351 (citation and internal quotations omitted). "Statements made by the coconspirator to allay suspicions are also admissible." United States v. Miller, 664 F.2d 94, 98 (5th Cir. Unit B December 18,1981) (per curiam) (citation omitted). Finally, "concealment is sometimes a necessary part of a conspiracy, so that statements made solely to aid the concealment are in fact made during and in furtherance of the charged conspiracy." United States v. Griggs, 735 F.2d 1318, 1325 (11th Cir. 1984) (per curiam) (quotations and citation omitted).

After a careful review of the record and the parties' briefs, we find no reversible error with regard to this issue. At trial, the government established that Harrison and Harrell had entered into a conspiracy to burn down Harrison's motel. The evidence presented by the government to support this finding included the facts that: (1) there was an arson, it was apparently an "inside job," and it was started by a gasoline-diesel fuel mixture; (2) Harrell returned to his home early on the morning of the fire smelling strongly of diesel and threatened Julie to forget what she had seen; (3) Harrison and Harrell were friends and Harrell had no apparent motive to harm Harrison; (4) Harrison had a motive to burn the motel, because it was his only asset that was losing money, and he was struggling to

26

maintain its financing; (5) Harrison and Harrell were in contact a number of times preceding the fire, and Harrell hid the nature of their conversations from Julie; and (6) Harrison and Harrell went out to lunch on the day after the fire.

The government also presented evidence that, during the investigation of the fire, an anonymous tip led the investigators to Harrell. In his statement to the investigators, Harrell admitted to being in the utility hallway where the fire started. He then told the investigators a story to explain this that involved Stacy Williams and Russ Presley. Evidence showed, however, that Williams was noticeably disabled and may not have been able to do some of the things Harrell described. It also showed that Harrell inquired as to Presley's whereabouts prior to making his statement to the police. In addition, there was evidence that Harrell downplayed and misrepresented his relationship with Harrison during the investigation.

The court was also permitted to consider the proffered co-conspirator statements in determining whether a conspiracy existed. See Magluta, 418 F.3d at 1178. In this regard, the government explained that Weaver would testify regarding Harrell's attempt to recruit him into the conspiracy, including that Harrell stated that Harrison had hired him to burn down the motel because it was losing money, and that Harrison had given him the key to the utility hallway. Julie also would testify, as fully addressed below, that Harrison and Harrell had met the

day before the arson.

On this evidence, the district court did not abuse its discretion by finding that the government had established, by a preponderance of the evidence, that a conspiracy existed between Harrison and Harrell. The fact that this decision relied, in part, on circumstantial evidence or logical inferences does not render it unsound. See United States v. Kennard, 472 F.3d 851, 856 (11th Cir. 2006), cert. denied, ___ U.S. ___, 127 S. Ct. 3004 (2007) ("[c]onspiracy may be proven by circumstantial evidence" (quotations and citation omitted)). Further, it was in the court's discretion to weigh the evidence as to the "hotly contested" question of the motel's true value to Harrison's business, and there is no evidence to suggest that its decision in this regard was an abuse of that discretion.

Thus, the court did not clearly err by, following a James hearing on the matter out of the presence of the jury, admitting the testimony of Dennis Weaver, who testified that Harrell tried to recruit him into the conspiracy and explained the details of the plan to him, as non-hearsay co-conspirator statements.

Similarly, the court did not clearly err by admitting the testimony of Julie Harrell, Harrell's wife, that he told her he was meeting Harrison the day before the arson to discuss a land deal.[3] Although the court did not hold a hearing regarding

_____

[3] As an initial matter, Harrell's statements to Julie were not hearsay and were admissible against him, once the marital privilege was waived, because they were his own statements.

28

this evidence and did not state the basis for its decision, because it could have provisionally admitted Julie's testimony as a non-hearsay co-conspirator statement pending the satisfaction of Rule 801(d)(2)(E), any error was harmless, as long as the evidence was ultimately admissible. See Fernandez, 797 F.2d at 946. Because, as already discussed, the government ultimately established that Harrison and Harrell were in a conspiracy, and because Harrell's statement to Julie was in the furtherance of that conspiracy in that it was reasonable to infer that it was intended to allay her suspicions, the statement was admissible. See Fed. R. Evid. 801(d)(2)(E); James, 510 F.2d at 550 (holding that because the coconspirator "was acting in the interests of the conspiracy by allaying these suspicions[, t]he statement was made in furtherance of the conspiracy"). Accordingly, the court did not abuse its discretion by admitting Julie's testimony either.

## B. Prior Consistent Statement

On appeal, Harrison essentially argues that the district court abused its discretion by admitting Weaver's testimony about Julie's statement regarding Harrison calling Harrell as a non-hearsay prior consistent statement. Harrison

---

Fed.R.Evid. 801(d)(2)(A); see United States v. Brown, 441 F.3d 1330, 1358 (11th Cir. 2006), cert. denied, ___ U.S. ___, 127 S. Ct. 1149 (2007). In this regard, it is notable that Harrison's counsel did not move to sever his and Harrell's trials following the court's decision that the marital privilege had been waived, did not ask for a limiting instruction with regard to Julie's testimony on redirect, and did not re-cross-examine her. Because Harrison does not raise these issues on appeal, they are abandoned. See United States v. Ford, 270 F.3d 1346, 1347 (11th Cir. 2001) (per curiam) ("issues and contentions not timely raised in the briefs are deemed abandoned" (citations omitted)).

contends that Julie's two references to calls by Harrison: her direct testimony that Harrell received five calls from Harrison in the months preceding the fire, and her diary entry that Harrison called on the day before the fire, were not consistent with Weaver's testimony that she told him Harrison called "numerous" times "each night leading up to the arson." Appellant's Br. at 23-25. Harrison further argues that Julie's veracity regarding the five calls was not attacked as a recent fabrication, and that her statement in her diary was only briefly referenced on cross-examination. Finally, Harrison argues that this error prejudiced him as it was "one of only two items that directly and undeniably demonstrated that [he] was involved in the arson." Id. at 27.

"A district court is granted broad discretion in determining the admissibility of a prior consistent statement under Fed. R. Evid. 801(d)(1)(B) and will not be reversed absent a clear showing of abuse of discretion." United States v. Drury, 396 F.3d 1303, 1317 (11th Cir. 2005) (quotations and citation omitted). Even if an evidentiary ruling is erroneous, that "ruling will result in reversal only if the resulting error was not harmless." United States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999) (citations omitted). An error is harmless "unless there is a reasonable likelihood that [it] affected the defendant's substantial rights." Id. (quotations and citation omitted). No reversal will result if "sufficient evidence

30

uninfected by error supports the verdict," and the error did not have a "substantial influence on the outcome" of the case. Id. (quotations and citation omitted). We will examine the entire record, comparing the error with "the strength of the evidence of defendant's guilt," to determine "whether an error had substantial influence on the outcome." Id. (quotations and citations omitted).

"A statement is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . . ." Fed. R. Evid. 801(d)(1)(B).

Under this rule, "[p]rior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited." Tome v. United States, 513 U.S. 150, 157, 115 S. Ct. 696, 701 (1995). Further, "[a] prior consistent statement is admissible only if it was 'made before the alleged influence, or motive to fabricate, arose.'" Drury, 396 F.3d at 1317 (quoting Tome 513 U.S. at 158, 115 S. Ct. at 701).

After a careful review of the record and the parties' briefs, we find no reversible error with regard to this issue. Here, the court admitted Weaver's testimony that Julie (the declarant) told him that Harrison had called numerous

31

times "each night leading up to the arson" on the government's argument that it was a non-hearsay prior consistent statement. R14-424 at 43. The government, however, did not explain what statement by Julie was confirmed by her statement to Weaver. There are only two possibilities: (1) Julie's direct testimony that Harrison called five times between October 2001 and January 2002; or (2) Julie's statement, in the entry in her diary read by counsel during her cross-examination, that Harrison called Harrell on the day before the arson.

Even assuming Julie's statement in her direct testimony is "consistent" with Weaver's testimony, the defense did not specifically challenge the truth of Julie's statement while on cross-examination. As a result, Weaver's testimony was not necessary to "rebut an express or implied charge" that this statement was a fabrication. See Fed. R. Evid. 801(d)(1)(B); Tome, 513 U.S. at 157, 115 S. Ct. at 701. As for Julie's statement in her diary, the court made no finding that suggests that Julie made the statement to Weaver before she made the entry in her diary or otherwise "before the alleged influence, or motive to fabricate, arose,'" see Tome, 513 U.S. at 158, 115 S. Ct. at 701, and none of the other evidence in the record directly bears on this question.

Even if we assume arguendo that neither of Julie's statements supported the admission of Weaver's testimony, the error, if any, was harmless, because there

was more than sufficient properly admitted evidence to support the verdict.  See

Hands, 184 F.3d at 1329.  Further, considering the record as a whole, and the lack

of any compounding error, it does not appear that any error here had a "substantial

influence on the outcome."  See id.  Julie had already testified that Harrison had

been calling Harrell during this period.  Weaver's improperly admitted testimony

only accentuated or emphasized this properly admitted statement.  Further,

Weaver's properly admitted testimony included the statement that Harrison had

hired Harrell to commit the arson and had even given him a key to the motel.

Accordingly, even if the admission of Weaver's testimony on this issue was error,

it was harmless error.

### C.  Reasonableness of Harrison's Sentence

Harrison essentially argues that his 180-month sentence, imposed following

the court's decision to vary upwards from the guideline sentencing range as

permitted by Booker, was unreasonable.  Specifically, he argues that because the

district court correctly calculated the guideline sentencing range, and because the

court based the variance on factors already considered in that calculation, that

variance was unreasonable.  Further, he argues that the court did not apply any

"reasonableness analysis" but simply rejected the range because it disagreed with

the guidelines' policies.

"After the district court has accurately calculated the [g]uideline range, it may impose a more severe or more lenient sentence that we review for reasonableness." United States v. Winingear, 422 F.3d 1241, 1244-45 (11th Cir. 2005) (per curiam) (citations and internal quotations omitted). Such review is deferential, requiring us to "evaluate whether the sentence imposed by the district court fails to achieve the purposes of sentencing as stated in [§ 3553(a)]." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) (per curiam). The party challenging the sentence has the burden of establishing that it is unreasonable. Id. "[T]here is a range of reasonable sentences from which the district court may choose." Id.

Sentencing post-Booker is a two step process. Id. at 786. First, the district court must consult the guidelines by accurately calculating a defendant's guideline range. Id. In this first step, if the court decides to apply a guideline departure, it must do so in accordance with the guidelines. See United States v. Ellis, 419 F.3d 1189, 1192-93 (11th Cir. 2005) (reversing, post-Booker, application of a guided § 5K2.7 upward departure because it was misapplied, but noting that this did not diminish the court's power to vary upwards under Booker). Second, the district must "consider [the § 3553(a) sentencing] factors to determine a reasonable

34

sentence." Talley, 431 F.3d at 786.[4]

After a careful review of the record and the parties' briefs, we find no reversible error with regard to this issue, either. Because both parties concede that the court correctly calculated the advisory guideline range, and it is clear from the record that the court adopted the PSI's advisory guideline calculation, the district court properly consulted the advisory guidelines. The court then found that, because the unique circumstances of this case were not adequately contemplated by the advisory guidelines, a sentence above those guidelines, based its independent analysis of the sentencing factors, was warranted. It based this decision on the fact that Harrison had conspired to set the motel on fire without any regard for its occupants, some of whom were especially vulnerable, and under circumstances where serious injury or even death was very likely. See 18 U.S.C. § 3553(a)(1), (2)(A). On this record, we cannot say the district court's sentencing rationale was unreasonable under Booker. Accordingly, Harrison has failed to demonstrate that his 180-month sentence was either procedurally or substantively unreasonable.

## III. CONCLUSION

---

[4] The § 3553(a) factors include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) whether the sentence is "sufficient, but not greater than necessary, to comply with . . . the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; and (3) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(1), (a)(2)(A), (a)(6).

The district court did not abuse its discretion by permitting two witnesses to testify about inculpatory statements a co-conspirator made to them prior to the arson. The district court's error in allowing a witness to testify regarding another witness's statement that Harrison had called codefendant Harrell frequently before the arson was harmless. Finally, Harrison's 180 month total sentence was reasonable. Accordingly, we **AFFIRM.**