[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 3,, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-13032

_____

D.C. Docket No. 02-00569-CR-PT-S

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JORDAN P. OLSHAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(JUNE 3, 2004)

Before DUBINA and CARNES, Circuit Judges, and MILLS*, District Judge.

CARNES, Circuit Judge:

_____

* Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

Jordan P. Olshan appeals his 90-month sentence for mail fraud and for filing a false income tax return, in violation of 18 U.S.C. § 1341 and 26 U.S.C. § 7206(1), respectively. He contends that he should not have received the two-level mass-marketing enhancement under U.S.S.G. § 2F1.1(b)(3) (2000), because he solicited only those within his existing client base and not the general public. He also contends that application of the two-level mass-marketing enhancement amounted to impermissible double counting because it overlapped with the enhancement he received for defrauding more than one victim.

I.

Olshan and his family had owned and operated Mortgage Investors, Inc. (MII) for over 60 years. The Birmingham, Alabama company bought, sold, originated, and serviced Alabama mortgages exclusively for the portfolios of its approximately 500 investors. Those investors collectively had around $53 million listed as investments on their accounts.

Between December 1998 and April 2001, in an effort to retain investors, Olshan encouraged clients to invest money with Mortgage Investors through a series of misrepresentations and omissions of material facts. He advised clients that "[their] income was fully protected," that the mortgages were first mortgages

made on a 60 percent loan-to-value ratio on single family dwellings, and that the mortgages became the personal property of the investors. In actuality, some of the properties were mortgaged at over 100 percent of their appraised value, were not single family dwellings, and had second or third mortgages, outstanding liens, or no clear title. Further, all of the investors' money was pooled and was often used to pay interest to other investors. Had one major investor "cashed out," Mortgage Investors would have been insolvent. In spite of those dire circumstances, Olshan routinely mailed "state of the company" letters which indicated that the company was a financial success.

In 1998, Olshan's concern about Mortgage Investors' liquidity caused him to develop and carry out a "corporate note scheme." This scheme had four components or purposes: (1) to eliminate cash balances on accounts in order to prevent investors from demanding immediate cash payments; (2) to issue corporate notes to new investors in lieu of mortgage assignments; (3) to entice investors not to demand payment for their cash positions by promising them a higher interest rate on corporate notes than was previously paid; and (4) to disguise the true identity of the corporate notes by assigning them an account number similar to the mortgage numbers normally used. From December 1999 to

April 2001, as a result of this scheme approximately $10.8 million in corporate notes was placed on the accounts of Mortgage Investors.

In March 2000, Olshan sold Mortgage Investors to Community Home Banc, Inc. Olshan held the position of vice-president of the bank and was responsible for maintaining its relations with Alabama investors. In order to entice clients to invest even more money with Mortgage Investors' successor, Community Home Bank, Olshan caused a special offering letter, known as the "war chest letter," to be mailed to the bank's investors on November 1, 2000. In that letter Olshan included several false claims, misrepresenting that: (1) Mortgage Investors and Community Home Bank were successfully consolidated, and the resulting company was profitable; (2) the bank anticipated lending $15 million in calendar year 2000, which would be $12 million more than the previous year; (3) because the holidays were historically the heaviest volume period, the purpose of the letter was to build a "war chest" in anticipation of the need for larger lending requirements; and (4) new monies received from investors before January 31, 2001, would earn 16 percent interest for amounts less than $100,000 and 16.5 percent for amounts over $100,000.

This fraudulent scheme brought forth $3.1 million from investors, $1.9 million of which was converted into corporate notes. Olshan did not maintain the

4

promised "war chest." Instead, the funds received under this scheme were commingled with others and used to continue temporarily Community Home Banc's operations which helped to hide its true financial condition.[1] Olshan also under reported his income on his 2000 federal tax return by $679,509.

As a result of that conduct, Olshan was charged by information with three crimes: two counts of mail fraud, in violation of 18 U.S.C. § 1341, and one count of filing a false income tax return in violation of 26 U.S.C. § 7206(1). He pleaded guilty to all three charges pursuant to a plea agreement.

In preparing the presentence investigation report, the probation office applied the November 1, 2000 edition of the guidelines manual. The report calculated an adjusted offense level of 31, which included a two-level enhancement under U.S.S.G. § 2F1.1(b)(2)(B) because he defrauded more than 1 victim, and a two-level enhancement under § 2F1.1(b)(3) because the offense was committed through mass marketing. After factoring in a three-level reduction for acceptance of responsibility, the report recommended a total offense level of 28.

---

[1] At the sentence hearing there was testimony about Olshan's participation in investment club seminars, which are referred to as "the Napier seminars." We do not detail those facts in this opinion or discuss them any further, because they are irrelevant to our conclusion. Olshan's mass mailings to his existing client base is enough factual basis on which to base a decision about the applicability of the § 2F1.1(b)(3) enhancement to this case.

Following a hearing, the district court accepted the recommendations contained in the presentence report and sentenced Olshan to prison for 60 months and 30 months respectively on counts one and two, to be served consecutively; and to 30 months on count three to be served concurrently with the time imposed on count two.

## II.

At the sentence hearing Olshan objected to the § 2F1.1(b)(3) two-level mass-marketing enhancement. He admitted that the mail was used to perpetrate the frauds he had committed; that there was a plan or scheme involving fraudulent intent; and that it involved investment for financial profit. Olshan also acknowledged that no fewer than 300 letters were sent out and at least 201 responses were received. For that reason he concedes that the "mass" component of "mass marketing" has been established, but he does not concede that the enhancement applies. Olshan contends that there is no "mass marketing" within the meaning of § 2F1.1(b)(3) where the targeted audience is drawn from the defendant's existing client list, however large, instead of from the public at large or some subgroup of it with whom the defendant has had no prior dealings. The district court rejected that contention, and so do we.

In the 2000 version of the sentencing guidelines, under which Olshan was sentenced, a defendant guilty of a fraud offense which is "committed through mass marketing" is to receive a two-level enhancement. U.S.S.G. § 2F1.1(b)(3) (2000). The commentary for that section of the guidelines provides that:

> "Mass-marketing" as used in subsection (b)(3), means a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (A) purchase goods or services; (B) participate in a contest or sweepstakes; or (C) invest for financial profit. The enhancement would apply, for example, if the defendant conducted or participated in a telemarketing campaign that solicited a large number of individuals to purchase fraudulent life insurance policies.

Id., cmt. n.3. Nothing about that commentary or the guideline itself suggests that it is not applicable to mass mailings to a subgroup of the public composed of the defendant's existing client base. So long as those solicited are a "large number of persons," an element Olshan concedes is met, there is no stranger requirement.

We will not read into the guidelines and their commentaries requirements that are not stated, or at least fairly implied, in them. And that is especially true where doing so would produce questionable results. The policy results of adopting Olshan's position would be more than a little questionable. Suppose there are two defendants and one of them has an existing list of 1000 clients with whom he has an ongoing relationship. They split the client list down the middle

for convenience and each one sends to the 500 names on his half of the list an identical fraudulent letter. Olshan would have us hold that in those circumstances the guidelines require that the defendant who is a stranger to the victims receive a harsher sentence than the defendant who betrayed his existing clients. If the Sentencing Commission wants us to reach such an anomalous result, it will have to tell us explicitly. Until then, we hold that the § 2F1.1(b)(3) mass marketing enhancement applies to fraud against an pre-existing group of clients to the same extent that it applies to fraud against strangers.

### III.

Olshan's second contention is that he should not have received the § 2F1.1(b)(3) mass marketing enhancement for another reason, which is that he also received the § 2F1.1(b)(2)(B) two-level enhancement because the scheme was to defraud more than one person. It's double counting to apply both, he says. He didn't say that at the sentencing hearing, so our review is limited to plain error, but we need go no further than the first step of the process, which asks whether there was any error at all.

"Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the

8

Guidelines." United States v. Matos-Rodriguez, 188 F.3d 1300, 1309 (11th Cir. 1999) (internal quotation omitted). "Double counting is permissible . . . when (1) the Sentencing Commission intended the result, and (2) each guideline section in question concerns conceptually separate notions related to sentencing. This Court presumes that, unless specifically directed otherwise, the Sentencing Commission intended that separate guidelines sections be applied cumulatively." United States v. Phillips, 363 F.3d 1167, 1168 (11th Cir. 2004) (per curiam) (internal citation and quotation omitted) (applying the guideline for failure to pay child support and a separate two-level enhancement for violating a court order was not double counting); see also United States v. Rendon, 354 F.3d 1320, 1333 (11th Cir. 2003).

We have no Eleventh Circuit decision directly on point as to application of both §§ 2F1.1(b)(2)(B) and 2F1.1(b)(3) in a single case, but a Tenth Circuit decision is helpful. In United States v. Fredette, 315 F.3d 1235 (10th Cir.), cert. denied, 538 U.S. 1045, 123 S. Ct. 2100 (2003), the defendant employed 12 to 14 telemarketers who sold virtually worthless fuel vouchers to car dealerships. Id. at 1237-38. The Tenth Circuit held that in order to prevail on his claim that application of both § 2F1.1(b)(3) and § 2F1.1(b)(2)(B) constituted impermissible double counting, Fredette would have to show that those two guideline provisions

9

necessarily overlapped, were not distinct, and served identical purposes.  Id. at 1244.  It then concluded that the two provisions did not overlap, were distinct, and did not serve identical purposes.  Id. at 1244-45 & n.4.

We agree with the Tenth Circuit.  Although an offense involving mass-marketing will almost always involve a scheme to defraud more than one person, the defrauding of more than one person can be and often is done without mass marketing.  Fredette, 315 F.3d at 1244-45.  The § 2F1.1(b)(2)(B) enhancement focuses on the victims harmed, while the § 2F1.1(b)(3) enhancement focuses on the method of inflicting the harm.  The provisions do not overlap to the extent necessary before impermissible double counting will be found.

AFFIRMED.