[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 25, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-13332

_____

D. C. Docket No. 05-60016-CR-RWG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES W. LONG,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(November 25, 2008)**

Before BIRCH and MARCUS, Circuit Judges, and FORRESTER,[*] District Judge.

PER CURIAM:

--------

[*] Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

Defendant-appellant James Long appeals his convictions for conspiracy to commit wire and mail fraud and substantive wire fraud, stemming from his operation of a payday loan company, Cash Today USA, Inc. ("Cash Today").[1] Long also challenges his 72-month sentence as procedurally and substantively unreasonable. After review of the record and consideration of the parties' briefs and arguments, we AFFIRM.

## I. BACKGROUND

A federal grand jury returned a ten-count indictment charging Long and Cash Today with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §§ 371, 1341, and 1343 (Count I) and substantive wire fraud, in violation of 18 U.S.C. § 1343 (Counts II-X).

In April 2001, Long filed Articles of Incorporation for Cash Today with the Florida Department of State and leased office space in a shopping center in Margate, Florida. The lease was signed by Long and Melvin Ruth as President and Vice President, respectively, of Cash Today. Long told federal authorities that while he was the owner of record of Cash Today, Ruth was his silent partner and had a 50% interest in the business. Ruth's name was not on the corporate documents, however, because Ruth was awaiting sentencing on a recent conviction

---

[1] Cash Today also was convicted but does not appeal.

for telemarketing fraud.

Between April and June 2001, Long opened bank accounts in the name of Cash Today USA at Regents Bank, Bank of America, and First Union. Some of the accounts were designated as trust accounts and others as operating accounts. Both Long and Ruth signed the signature card as President and Vice President of Cash Today USA, Inc., respectively, on the account Long opened at First Union. Cash Today hired independent sales offices ("ISO") to raise start-up capital from investors and agreed to pay them a 40% commission on all revenue raised for Cash Today by their sales agents. Long, Ruth, and the sales agents operated from the offices in the back of a check-cashing store doing business as Republic Cash Advance ("RCA"). Cash Today and RCA entered into an agreement pursuant to which Cash Today would loan investor funds to RCA, in exchange for which Cash Today would receive a 20% annual return, paid 5% quarterly.

Prior to trial, Long filed a motion to suppress evidence, including bank records, Federal Express receipts, investor records, and contracts between Cash Today and its sales associates, seized during a search of Cash Today's offices. Long argued that there was no probable cause for the search and that the search warrant failed to state with particularity the items to be seized. The application and affidavit that was prepared by FBI Agent Richard Kiper and submitted to the

3

magistrate judge on 28 June 2001 detailed the government's investigation into Cash Today and alleged that there was probable cause to believe that the offices of Cash Today contained evidence of mail fraud, in violation of 18 U.S.C. § 1341, wire fraud, in violation of 18 U.S.C. § 1343, money laundering, in violation of 18 U.S.C. § 1956, and conspiracy, in violation of 18 U.S.C. § 371.

Specifically, Agent Kiper attested that: (1) subpoenaed bank records showed that Cash Today transferred $1,134,000 of the $2.1 million in investor funds out of a trust account and into an operating account in order to use those funds to pay commissions and consulting fees; (2) Cash Today's offering materials and purchase agreements misrepresented that investor funds would be placed into segregated accounts and used exclusively to facilitate loans to Cash Today's customers; and (3) Florida Office of the Comptroller records showed that Cash Today had never applied for money transmitter licenses, which are required for every check-cashing location. The affidavit also identified two Cash Today investors who invested $10,000 and $50,000, respectively, after being told by Cash Today sales agents that Cash Today operated seventeen check-cashing stores in Florida and that their investments would be held in a trust account. Neither investor was told that sales commissions would be paid from their investments.

At the suppression hearing, Agent Kiper conceded that the one-page search

4

warrant did not describe the premises to be searched or identify the documents to be seized, but testified that a description of the location of Cash Today's offices ("Attachment A") and a list of twelve specific items to be seized ("Attachment B") were part of the package submitted to and signed by the magistrate judge.[2] Agent Kiper was unable to recall whether the attachments were stapled or paper-clipped to the affidavit but testified that they were "touching" the affidavit and that the issuing magistrate judge read the entire affidavit in his presence.[3] Agent Kiper further testified that during a pre-operations briefing he reviewed with the search team the affidavit and attachments and discussed the scope of the search, including the twelve specific items to be seized.

The magistrate judge issued a report and recommendation finding that the warrant was supported by probable cause because the affidavit listed the specific statutes allegedly violated and detailed the FBI's investigation, which revealed a

---

[2] Attachment B to the affidavit, entitled "Description of Property to be Seized," listed the following items: (1) customer/investor account information; (2) customer correspondence; (3) financial and banking records; (4) other correspondence; (5) sales literature, including "welcome packs"; (6) telephone records; (7) telephone "scripts" and other telemarketing aids; (8) computer internal and external hard drives, floppy disk drives and diskettes, tape drives; (9) records of mailings, facsimile copies, and courier records; (10) overnight mail receipts; (11) purchase/sale/trade records and other documents/records related to the purchase and maintenance of "receivables," corporate notes, stocks, or private placement contracts; (12) cash, cashier's checks, and other negotiable instruments.

[3] Although the warrant incorporated Attachment A by reference, it made no reference to Attachment B. At the suppression hearing, the government stated that this omission was a "typographical goof" by the AUSA and also an "oversight" by the magistrate judge.

"Ponzi" scheme encompassing mail and wire fraud, money laundering, and other federal offenses. The magistrate judge further found that the omission of any reference to Attachment B did not render the warrant invalid because the warrant and its attachments were presented to the issuing magistrate judge and the scope of the search was discussed specifically with the search team prior to execution of the warrant. The district court adopted the recommendation and denied the motion.

At trial, Salvatore DeStefano, one of Cash Today's investors, testified that in April 2001, he received a telephone call from Lorena Kaus, who identified herself as a Cash Today sales agent. She explained that she was offering an opportunity to invest in a check-cashing and payday advance loan company that was licensed to do business in Florida. Kaus faxed to DeStefano at his home in New Jersey marketing and promotional materials, which stated that the investor would receive an annualized 42% return on his minimum investment of $10,000, paid at 3.5% per month by the third of each month, and that TeleCheck would be the guarantor on all accounts receivable. DeStefano testified that he was familiar with TeleCheck, which he understood to be a "fairly well-known company. . . that reduces the risk of merchants in accepting checks." The materials further represented that Cash Today was initially incorporated in Nevada in 1996 and had "a completely unblemished three-year history of growth that includes two years of independent

6

CPA audited financials."

Cash Today thereafter sent DeStefano an Accounts Receivable Purchase Agreement ("purchase agreement"), which DeStefano signed and returned to Cash Today on 23 April 2001. The purchase agreement stated, inter alia, that: (1) Cash Today was a "validly formed existing corporation in good standing under the laws of the state of Florida and . . . is properly licensed and authorized to operate its business under the trade name Cash Today"; (2) "TeleCheck will guarantee all accounts purchased by [the investor]"; and (3) all investor funds would be "deposited in segregated accounts receivable fund at an FDIC insured bank" and "utilized exclusively and solely for the purpose of facilitating loans to clients' customers." The agreement further stated that Cash Today acknowledges and understands that the investor has relied on these representations and warranties in entering the purchase agreement.

Pursuant to the wiring instructions he received from Cash Today, DeStefano wire-transferred $20,000 to a Cash Today trust account at a Bank of America in Deerfield Beach, Florida. After making the transfer, DeStefano received a signature page to the purchase agreement, which was signed by J.W. Long as president of Cash Today and witnessed by Melvin Ruth. DeStefano also received via fax an addendum to the purchase agreement and a letter via mail confirming his

purchase of $20,000 of accounts receivable, both signed by J.W. Long.

DeStefano testified that he believed, based on the representations contained in the promotional materials and the purchase agreement, that: (1) his investment would be used to fund the start-up corporation, Cash Today; (2) Cash Today was in the business of making temporary payday advance loans to the general public; (3) Cash Today was the entity making the actual loans for check-cashing purposes, not RCA; (4) "there would be no commingling of funds, that basically each investor's funds would be maintained in a separate account and that 100 percent of those funds would be used exclusively, solely, and for no other purpose than to fund payday loans"; and (5) Cash Today had entered into a contract with TeleCheck whereby the latter would "guarantee the receipts on the payments that were made to . . . Cash Today USA."

DeStefano testified that he would not have invested his money but for these representations. Specifically, he stated that it was "critical" to him that "the accounts receivable purchase agreement included the representations that TeleCheck guaranteed the payment, that the funds Cash Today accepted from investors were being put into separate accounts, broken down by investor, and that 100 percent, that is all of the funds, were going to be used solely, specifically, and exclusively for funding this corporation and . . . for funding the loans and for no

8

other purpose."  He stated that he "absolutely" would not have invested in Cash Today had he known that TeleCheck had no relationship with Cash Today or that his money would not be maintained in a segregated account.

DeStefano received his last interest check on 1 June 2001. Some time thereafter, Long sent DeStefano a letter advising DeStefano that the government had unjustifiably frozen Cash Today's accounts and assuring him that Cash Today had "done nothing wrong."  In October or November, DeStefano received a money order in the amount of $210 from Cash Today.  According to the letter accompanying the money order, the payment was a "good faith showing on the part of Cash Today USA that they intended to resume business normally in short order."  Out of the $20,000 DeStefano invested with Cash Today, he received back only $1000, resulting in a loss of $19,000.

In addition to DeStefano, the government called eleven other Cash Today investors, all of whom gave substantially similar accounts of their experiences with Cash Today.  The investors testified that, after receiving and responding to unsolicited internet advertisements, they were contacted via telephone by Cash Today sales agents, who offered them the opportunity to invest in a start-up company that would use their investments to make payday advance loans to customers at its check-cashing stores. The investors also received in the mail Cash

Today's promotional materials, instructions for wire-transferring their investments to Cash Today's trust account in Florida, and the accounts receivable purchase agreement. The solicitation materials received by some of the investors contained a letter, signed by Long, which promised a 3.5% monthly return "collateralized" by customer checks that would be guaranteed by TeleCheck. Some letters promised only a three percent return.

All of the investors signed the purchase agreement, which contained the same representations made in the agreement signed by DeStefano, including that Cash Today was properly licensed and authorized to do business in Florida, that TeleCheck would guarantee all accounts purchased by the investor, and that all investor funds would be maintained in segregated trust accounts and utilized exclusively and solely for the purpose of facilitating loans to Cash Today's customers. The purchase agreement further represented that no commissions would be paid out of the investor funds and that all expenditures, including fees paid to the ISO's, would be paid directly by Cash Today.

The investors testified that they relied on these representations as well as representations that Cash Today operated several check-cashing stores in Florida, in deciding to invest their money. Some testified that Cash Today never disclosed to them its relationship with RCA and they would not have made the investments

10

had they known that their money would be used to make loans to RCA. After wire-transferring their investments to Cash Today's trust account and receiving some initial interest payments, the investors were advised in a letter from Long that the government had frozen Cash Today's bank accounts and received no further interest payments.

Soneet R. Kapina, a forensic accountant who reviewed Cash Today's records, testified as an expert witness that between April and June 2001, Cash Today collected $2,169,946.93 from investors. While only $61,543.92 was paid out to investors in dividends, $755,000 was paid to RCA, $865,416.19 to the sales agents, and $208,891.00 to Long.[4] Out of the 110 Cash Today investors, only 101 or 102 actually received any interest payments in April and June 2001. In total, Cash Today paid out $2,242,282.65, leaving only $146,996.43 in Cash Today's bank accounts.[5]

Based on his review of Cash Today's financial records, Kapina determined that Cash Today was not operating any sort of business that would generate a flow

---

[4] Other cash disbursements included: (1) $100,260.21 in payment of operational costs and expenses to various persons and entities; (2) $14,192.81 in bank card fees; (3) $54,005.00 to Rolando Nansca, an independent sales agent; (4) $50,000 to Doreen Kafi, an RCA manager; (5) $72,200 to a company called "Success Direct"; (6) $7,337.52 in unidentifiable, miscellaneous disbursements; (7) $1500 in automatic teller machine ("ATM") fees; and (8) $1936 in other bank fees.

[5] RCA returned to Cash Today $219,032 of the $755,000 it received.

11

of income by investing the investor funds. Because Cash Today had no active source of income or revenue, Kapina concluded that these disbursements were made exclusively from investor monies and that Cash Today was thus incapable of paying the rate of return promised in the purchase agreements. The only way Cash Today could have paid dividends was by raising more investor funds from new investors and paying earlier investors with the money raised from later investors. Kapina stated that Cash Today's operation "ha[d] all the tell tale classic signs of what is often referred to as a Ponzi scheme," which, he explained, denotes a scheme whereby an entity pays earlier investors with money raised from later investors, "[a]nd there is no real intrinsic business which generates money with which to make returns." Kapina agreed that, in his opinion, Cash Today was an artifice and scheme to defraud investors.

Long testified in his own defense that when he began raising capital for Cash Today, it was not his intent to defraud investors but simply "to get the company up and running, make it successful" and "to become financially secure to go into other fields." He admitted that Cash Today had no relationship with TeleCheck and that the language in the investors' purchase agreements stating that all checks would be guaranteed by TeleCheck was "not true," but maintained that those misrepresentations were "unintentional" and that he "never lied to anyone." Upon

12

follow-up questioning by the district judge, Long admitted that he moved funds from the trust account, which contained the investors' money, to the operating account, in order to pay expenses, including commissions.

At the close of testimony, the district court instructed the jury that Cash Today was to be considered a person and, under the same rules that apply to a personal defendant, could be found guilty of any offense charged. With respect to the conspiracy charge, the district court instructed the jury that the government had to prove that "two or more persons in some way or manner came to a mutual understanding to try to accomplish a common and unlawful plan. . . [and] that the defendants knowing the unlawful purpose of the plan wilfully joined in it."

The jury found Long and Cash Today guilty on all ten counts of the indictment. In anticipation of sentencing, the probation officer prepared a presentence report ("PSI"). The PSI grouped the ten counts together and recommended a base offense level of six. See U.S.S.G. §§ 3D1.2(d) and 2F1.1(a) (Nov. 1, 2000). Because Long was accountable for losses totaling $2,100,000, his base offense level was increased twelve levels pursuant to § 2F1.1(b)(1)(M). Long received a two-level increase under § 2F1.1(b)(2) because the offense involved more than minimal planning or a scheme to defraud more than one victim and an additional two-level increase under § 2F1.1(b)(2) because the offense was

13

committed through mass-marketing. Finally, the PSI applied a four-level increase under § 3B1.1(a) based on Long's leadership role in the offense. With a total offense level of 26 and a criminal history category of I, Long's guidelines range was 63 to 78 months of imprisonment.

Long filed objections to the PSI, arguing that applying the two-level enhancements under both U.S.S.G. §§ 2F1.1(b)(2) and (b)(3) constituted impermissible double counting because the same conduct was used to support separate increases under two different guideline provisions that served identical purposes. The district court overruled the objection, finding that the two provisions "relate to two separate and distinct factors, namely the means used to perpetrate the fraud and the number of victims."

The court then stated that it had thoroughly reviewed the PSI and considered the statements of all the parties, the advisory guidelines, and the 18 U.S.C. § 3553(a) factors. The court noted that Long had defrauded "trusting" and "elderly people" out of their money, which some of the victims had been using "for medical expenses," and had shown no compunction about his criminal behavior. Nevertheless, the court stated that it believed a sentence within the advisory guideline range was appropriate to reflect the seriousness of the offenses and provide just and reasonable punishment. The court then sentenced Long to 72

14

months of imprisonment,[6] concluding that "[t]his [was] a reasonable sentence after considering 18 U.S.C. § 3553(a)1-7, as well as the arguments for and against mitigation or extenuation of punishment."

Long now appeals his convictions and sentence.

## II. DISCUSSION

Long raises numerous challenges to his convictions and sentence. Specifically, he argues that: (1) the district court erred in denying his motion to suppress evidence seized during the search of Cash Today's offices; (2) the cumulative effect of various trial errors deprived him of a fair trial; (3) the evidence was insufficient to support his convictions; and (4) his sentence was unreasonable. All of these arguments fail. We address each in turn.

A. Motion to Suppress

Long argues that the district court erred in denying his motion to suppress physical evidence seized from Cash Today's offices because: (1) the allegations contained in the search warrant affidavit were insufficient to establish probable cause to believe that Cash Today's operations involved criminal activity, and (2) the warrant lacked a description of the persons or things to be seized and thus was invalid on its face.

---

[6] Long was sentenced to 60 months of imprisonment as to the first nine counts, all to run concurrently, and 12 months of imprisonment as to the final count, to run consecutively.

We review the district court's factual findings on a motion to suppress for clear error and its application of law to those facts de novo. United States v. Mercer, 541 F.3d 1070, 1073-74 (11th Cir. 2008) (per curiam). In conducting our review, we construe the facts in the light most favorable to the party prevailing in the district court. Id. at 1074.

1. Probable Cause

We review de novo whether an affidavit established probable cause for a search warrant, "tak[ing] care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quotation marks and citation omitted). Due to the discretionary nature of the issuing judge's probable cause determination, "our limited task on appeal is simply to ensure that there exists a substantial basis for her conclusion." United States v. Foree, 43 F.3d 1572, 1576 (11th Cir. 1995) (quotation marks and citation omitted).

Based on our review of the record, including the application for search warrant and attached affidavit, we find that, under the totality of the circumstances in this case, the issuing magistrate judge had a substantial basis for concluding that probable cause existed to believe that Long and Cash Today were violating federal

16

law and that evidence of a crime would be found at Cash Today's offices.

2. Particularity of Warrant

A warrant must describe with particularity the place to be searched and the items or persons to be seized in order to satisfy the Fourth Amendment. See United States v. Jenkins, 901 F.2d 1075, 1081 (11th Cir. 1990). The purpose of this "particularity requirement" is to prevent "general, exploratory rummaging in a person's belongings." United States v. Wuagneux, 683 F.2d 1343, 1348 (11th Cir. 1982) (quotation marks and citation omitted). A warrant that fails to particularize the things to be seized is thus facially deficient. See United States v. Accardo, 749 F.2d 1477, 1481 (11th Cir. 1985).

We acknowledge that the warrant in this case was, on its face, clearly insufficient under the Fourth Amendment. Nevertheless, the undisputed testimony of Agent Kiper establishes that Attachment B, which contained a list of twelve specific items to be seized from Cash Today's offices, was attached to the affidavit and that the issuing magistrate judge reviewed the entire affidavit in Agent Kiper's presence. A reasonable inference may be drawn from these facts that the magistrate judge read all of the materials presented to her, including Attachment B, and thus was aware of the scope of the search she was authorizing. Cf. Groh v. Ramirez, 540 U.S. 551, 561 n.4, 124 S. Ct. 1284, 1292 n.4 (2004) (holding warrant

17

describing items to be seized as a "two-story blue house" invalid where "petitioner did not alert the Magistrate to the defect . . ., and [the Court] therefore cannot know whether the Magistrate was aware of the scope of the search he was authorizing").

B.  Trial Errors

We review the cumulative impact of multiple errors de novo, though some errors might individually be reviewed for plain error.  United States v. Dohan, 508 F.3d 989, 993 (11th Cir. 2007) (per curiam).  Reversal of a conviction may be warranted where the cumulative effect of multiple errors is so prejudicial that a defendant was deprived of the right to a fair trial, even though the errors considered individually were harmless. United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005) (per curiam).

1. District Court's Participation in Trial

Long argues that the district court impermissibly participated in the case by: (1) acknowledging that the government's witnesses had traveled far distances to testify and thanking them for their testimony; (2) eliciting testimony from a bank employee verifying the accuracy of the government's financial evidence; (3) instructing Long to answer the questions asked and to give more specific responses; and (4) cross-examining Long in the presence of the jury regarding his improper handling of investor funds.  Long contends that the district court's

18

comments impugned his credibility, reflected bias in favor of the government, and unfairly influenced the jury.

A federal trial judge "is more than a mere moderator; he is the governor of the trial process, vested with the duty to insure that the law is properly administered." United States v. Jacquillon, 469 F.2d 380, 387 (5th Cir. 1972). Accordingly, he may comment on the evidence, question witnesses in order to elicit or clarify facts, and interrupt counsel when necessary to maintain the pace of a trial. United States v. Day, 405 F.3d 1293, 1297 (11th Cir. 2005). In doing so, however, "he must maintain his impartiality, never giving the jury an impression of his feelings as to the accused's guilt or innocence." United States v. James, 510 F.2d 546, 550 (5th Cir. 1975). "Only when the judge's conduct strays from neutrality is the defendant thereby denied a constitutionally fair trial." United States v. Harris, 720 F.2d 1259, 1262 (11th Cir. 1983) (quotation marks and citation omitted).

The trial transcript shows that Long was at times non-responsive, prompting the district judge on three occasions to instruct Long to answer only the questions that specifically were asked. The judge also advised Long at one point that "the jury might get more out of [his] testimony if [he] could use clearly responsible [sic] names [and] dates." At the end of Long's lengthy testimony, the judge stated

19

that he had "a couple of questions just to clear up something" regarding Cash Today's bank accounts and sources of income. The judge then asked Long a series of fifteen questions, all of which were intended to clarify his testimony. At no time did the district court improperly comment on Long's credibility or otherwise indicate that he believed Long was guilty. The record further reflects that, excluding his exchanges with Long, the judge asked a total of eleven questions of five separate government witnesses over the course of the entire trial. It is clear from our reading of the record that these questions were intended merely to clarify the witnesses' testimony and in no way evinced any bias in favor of the government's case.

We find that the jury could not reasonably have interpreted the district court's remarks as expressing an opinion that Long was guilty of the offenses charged. Even assuming there was error, it was cured by the judge's instruction to the jury that it was not to assume from any comments he made that he had any opinion concerning any of the issues in the case and that it was to "disregard anything [he] may have said during the trial in arriving at your own decision concerning the facts." See United States v. Simon, 964 F.2d 1082, 1087 (11th Cir. 1992) ("[A] prejudicial remark may be rendered harmless by curative instructions to the jury.") (quotation marks and citation omitted).

20

2. Expert Witness Testimony

Long argues, for the first time on appeal, that the forensic accountant improperly testified as to his mental state when he testified that Cash Today was a ponzi scheme. Because Long failed to object to the introduction of this testimony at trial, our review is for plain error only. See United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005). To prevail under this standard, the appellant must demonstrate an "(1) error, (2) that is plain, and (3) that affects substantial rights." United States v. Moriarty, 429 F.3d 1012, 1019 (11th Cir. 2005) (per curiam) (citation omitted). In order to satisfy the third prong of the plain error test, the defendant must show that the alleged error was prejudicial, i.e., that there is a reasonable probability, which means a probability "sufficient to undermine confidence in the outcome," that the result of the proceedings would have been different but for the alleged error. Rodriguez, 398 F.3d at 1299 (quotation marks and citation omitted). "[W]here the effect of an error on the result in the district court is uncertain or indeterminate," the appellant cannot carry his burden of showing prejudice. Id. at 1301.

An expert witness may not testify as to his opinion regarding ultimate legal conclusions. See Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness . . . may not testify to the legal implications of

conduct; the court must be the jury's only source of law."). Although this rule prevents an expert witness from stating an opinion as to whether the defendant did or did not have the requisite mental state to be convicted of the crime charged, the witness may testify as to his opinion on an ultimate issue of fact. See Fed.R.Evid. 704(a). Nevertheless, "courts must remain vigilant against the admission of legal conclusions." United States v. Milton, 555 F.2d 1198, 1203 (5th Cir. 1977).

Kapina's statement that Cash Today bore the hallmarks of a "Ponzi scheme" described Cash Today's financial practices but offered no conclusion as to whether Long participated in these practices with the intent to defraud investors. Because this statement was a factual, and not a legal, conclusion, it was admissible under Rule 704. See United States v. Nixon, 918 F.2d 895, 905 (11th Cir. 1990). Kapina's statement that Cash Today was an artifice or scheme to defraud is more problematic, however, because it comes much closer to embodying an impermissible legal conclusion. See United States v. Scop, 846 F.2d 135, 40 (2nd Cir. 1988) (expert's opinions that "drew directly upon the language of the statute and accompanying regulations concerning 'manipulation' and 'fraud'. . . were legal conclusions that were highly prejudicial and went well beyond his province as an expert in securities trading"); cf. Nixon, 918 F.2d at 905 (police detective's use of term "conspiracy" was permissible because "it did not track unduly the

22

definition of the offense in 21 U.S.C. § 846"). Although this statement was plainly inadmissible, Long nevertheless cannot show that his substantial rights were affected. Given the overwhelming evidence of guilt adduced at trial, there is no reasonable probability that the result of the trial would have been different had the district court excluded this single remark. Accordingly, Long has failed to satisfy the third prong of the plain error test.

3. Jury Instructions

Long contends that because he was the sole officer and shareholder of Cash Today, the district court erred in failing to instruct the jury that there can be no criminal conspiracy between a defendant and a corporation where the corporation is merely the defendant's alter ego. It is true that "a sole stockholder who completely controls a corporation and is the sole actor in performance of corporate activities [] cannot be guilty of a criminal conspiracy with that corporation in the absence of another human actor." United States v. Stevens, 909 F.2d 431, 431-32 (11th Cir. 1990). In this case, however, there was abundant evidence that Long was working in concert with at least one other human actor, Melvin Ruth, to commit fraud. See United States v. Figueroa, 720 F.2d 1239, 1245 n.8 (11th Cir. 1983) ("[A]n individual can be convicted of conspiracy with 'unknown persons' referred to in the indictment.") (citation omitted). Because Long was not "one

23

human actor, acting for himself and for the corporate entity which he controls,"

Stevens, 909 F.2d at 433, the district court had no basis for issuing an alter-ego

instruction.[7]

4. Government Comments

Finally, Long argues that because the defense does not have equal subpoena

power over FBI agents, the prosecutor improperly commented on the defense's

failure to call the lead FBI agent as a witness. In his rebuttal closing argument, the

prosecutor stated:

> [W]hy didn't [defense counsel] bring Agent K[i]per in?. . . The
> Federal Rules of Criminal Procedure in this Country give[] fairness to
> every party. Rule 17, he could have subpoenaed Mr. K[i]per. He had
> the authority and the right to do it. It's right here in the rules. Who is
> he k[i]dding. Each side has equal powers.

Long contends that these comments had the impermissible effect of shifting the

burden of proof to the defense.  Long failed to raise this objection at trial, and thus

our review is for plain error only. See Rodriguez, 398 F.3d at 1298.

We must consider allegedly improper prosecutorial comments in context

---

[7] Long also asserts that the district court failed to hold a charge conference in order to invite objections to the proposed jury instructions.  The government states in its brief, however, that, according to the prosecutor, a charge conference was held on 6 March 2007, but was not transcribed.  Although we have no reason to doubt that this was the case, we note that even if the district court indeed failed to hold such a conference, as Long alleges, Long was not prejudiced by this failure because, given the overwhelming evidence of Ruth's participation in Cash Today's operations, there is no reasonable probability that the court would have given the alter-ego instruction.

when evaluating their propriety. See United States v. Bright, 630 F.2d 804, 825 (5th Cir. 1980). "[W]hile a prosecutor may not comment about the absence of witnesses or otherwise attempt to shift the burden of proof, it is not improper for a prosecutor to note that the defendant has the same subpoena powers as the government, particularly when done in response to a defendant's argument about the prosecutor's failure to call a specific witness." United States v. Hernandez, 145 F.3d 1433, 1439 (11th Cir. 1998) (quotation marks and citation omitted). It also "is not error to comment on the failure of the *defense*, as opposed to the *defendant*, to counter or explain the evidence." United States v. Griggs, 735 F.2d 1318, 1321 (11th Cir. 1984) (per curiam) (quotation marks and citation omitted).

The record reflects that in his closing statement, defense counsel asked the jury to consider why the government failed to call Agent Kiper as a witness:

> Well, who is the lead Agent in this case? It was Agent Richard K[i]per. Why didn't he testify? He was the lead agent in this case. He was the person with all the information about everything going on, but why wasn't he called? . . . That's something you can consider in deciding whether or not the Government has met their burden.

The prosecutor's comments, which were made in direct response to this argument, "referred . . . to the quality (or lack thereof) of the defense's evidence and the defense's failure to rebut the necessary inferences created by the government's case." United States v. Exarhos, 135 F.3d 723, 728 (11th Cir. 1998). Moreover,

25

even if the prosecutor's comments were prejudicial, they were rendered harmless by the court's instruction to the jury regarding the burden of proof. See Simon, 964 F.2d at 1087. Accordingly, we conclude that the prosecutor's comments were not improper.

C. Sufficiency of the Evidence

Long argues that the government presented no evidence that he knew, prior to receiving money from the investors, that his business plan was untenable, and thus failed to prove that he knowingly participated in a scheme to defraud or had the specific intent to defraud. He contends that the evidence showed that he was guilty, at worst, of exaggerating the quality of the investment.

We review de novo the sufficiency of the evidence in a criminal trial, viewing the evidence in the light most favorable to the government, and must uphold a conviction "unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999); see also United States v. Keller, 916 F.2d 628, 632 (11th Cir. 1990) ("In order to uphold . . . the jury's guilty verdict, this court need only find that a reasonable factfinder could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt.").  In evaluating the evidence, all reasonable inferences and credibility choices are made in support of

26

the verdict.  See United States v. Mieres-Borges, 919 F.2d 652, 656 (11th Cir. 1990).  To establish that the government's evidence was insufficient, "[i]t is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006), cert. denied, — U.S. — , 127 S.Ct. 2155 (2007).

"Aside from the means by which a fraud is effectuated, the elements of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, are identical," both requiring that the defendant "(1) intentionally participates in a scheme or artifice to defraud another of money or property, and (2) uses or 'causes' the use of the mails or wires for the purpose of executing the scheme or artifice." United States v. Ward, 486 F.3d 1212, 1221-22 (11th Cir. 2007) (footnotes omitted).  "A scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts . . . reasonably calculated to deceive persons of ordinary prudence." United States v. Hasson, 333 F.3d 1264, 1270-71 (11th Cir. 2003) (quotation marks and citations omitted).  In addition to showing that the defendant's actions would have deceived a reasonably prudent person, the government must also prove that the defendant had the requisite mens rea, which is

27

a "conscious knowing intent to defraud." Pelletier v. Zweifel, 921 F.2d 1465, 1499 (11th Cir. 1991) (quotation marks and citation omitted). The mens rea element is satisfied where "the perpetrator of the scheme *anticipate[s]* reliance." Id. (emphasis added).

A conviction for conspiracy under 18 U.S.C. § 371 requires proof of "(1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement." Hasson, 333 F.3d at 1270. The government need not prove that the defendant made a specific agreement to use the mails or interstate wires to commit fraud; "it is enough to prove that the defendant knowingly and voluntarily agreed to participate in a scheme to defraud and that the use of the interstate wires in furtherance of the scheme was reasonably foreseeable." Id.

The evidence in this case, including the testimony of the investors and the forensic accountant, showed that Long and Cash Today, through its officers and agents, made material misrepresentations to investors, regarding, inter alia, the handling and use of investor funds, Cash Today's relationship, or lack thereof, with TeleCheck, and the nature of Cash Today's business. Although this evidence likely was alone sufficient for a jury to infer that Long intended to defraud the

28

investors, we need not so decide because Long testified in his own defense. We have held that the testimony of a defendant, if discredited by the jury, "may be considered as *substantive* evidence of the defendant's guilt." See United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995). Even more significantly, "where some corroborative evidence of guilt exists . . . the defendant's testimony, denying guilt, may establish, by itself, elements of the offense. This rule applies with special force where the elements to be proved for a conviction include highly subjective elements: for example, the defendant's intent or knowledge." Id. at 314-15.

While Long testified that he did not intend to defraud Cash Today investors, the jury was entitled to assess Long's testimony and demeanor, make an adverse determination as to his credibility, and reject his statements as a complete fabrication. See United States v. Vazquez, 53 F.3d 1216, 1225-26 (11th Cir. 1995). The jury also was entitled to conclude that the opposite of his testimony was true, to wit, that he did participate in the scheme with the intent to defraud. See id. at 1226; Brown, 53 F.3d at 314 ("[W]hen a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true.") (quotation marks and citation omitted). Accordingly, the evidence was sufficient to support Long's convictions.

D. Long's Sentence

1. Mass Marketing Enhancement

Long argues for the first time on appeal that the mass-marketing enhancement was wrongly applied.[8] Long concedes that he engaged in "targeted electronic correspondence to approximately 114 persons," but argues that this conduct did not establish "a distinct mass marketing course of conduct as required under U.S.S.G. § 2F1.1(b)(3)." Appellant's Brief at 48. We review this issue, raised for the first time on appeal, for plain error only. See Rodriguez, 398 F.3d at 1298. An error that is not clear under current law cannot be "plain." United States v. Castro, 455 F.3d 1249, 1253 (11th Cir. 2006) (per curiam). Accordingly, "[w]hen the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." Id. (quotation marks and citation omitted).

Section 2F1.1(b)(3) of the 2000 version of the Guidelines provided for a two-level increase in a defendant's base offense level if the offense "was committed through mass-marketing." U.S.S.G. § 2F1.1(b)(3) (Nov. 1, 2000). The commentary defines "mass-marketing" as "a plan, program, promotion, or

_____

[8] Long does not challenge the district court's application of the multiple-victim enhancement under U.S.S.G. § 2F1.1(b)(2).

30

campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to . . . invest for financial profit." U.S.S.G. § 2F1.1 cmt. n.3.

Even assuming, arguendo, that the district court erred in applying the enhancement under the facts of this case,[9] Long cannot carry his burden under the second prong of plain error review because the explicit language of U.S.S.G. § 2F1.1(b)(3) does not specifically resolve the issue and he has identified no binding precedent, either from our circuit or the Supreme Court, supporting his contention that the solicitation of 114 investors is insufficient to bring a defendant within the scope of the mass-marketing enhancement. See Castro, 455 F.3d at 1253. Accordingly, the district court's application of the § 2F1.1(b)(3) enhancement cannot be plain error.

2. Double-Counting Claim

Long argues that the enhancement of his sentence under both U.S.S.G. § 2F1.1(b)(2) and (b)(3) constituted impermissible double counting. "We review de novo a claim of double counting." United States v. Dudley, 463 F.3d 1221,

_____

[9] We note that in this case, Long admitted to soliciting at least 114 investors via Internet and telephone. Further, several investors testified that they received unsolicited e-mail advertisements and subsequently were contacted by telephone by sales agents who induced them to invest in Cash Today by promising them a high rate of return. Based on this evidence, the district court reasonably could conclude that Long solicited a sufficiently "large number of persons" to warrant application of the mass-marketing enhancement. See U.S.S.G. § 2F1.1 cmt. n.3.

31

1226 (11th Cir. 2006). Long's argument is foreclosed by <u>United States v. Olshan</u>, 371 F.3d 1296 (11th Cir. 2004), in which we held that applying both U.S.S.G. § 2F1.1(b)(2)(B) (scheme to defraud more than one victim) and (b)(3) (mass-marketing) to the same conduct does not constitute impermissible double-counting because "[t]he § 2F1.1(b)(2)(B) enhancement focuses on the victims harmed, while the § 2F1.1(b)(3) enhancement focuses on the method of inflicting the harm."[10] <u>Id.</u> at 1301.

3. Reasonableness of Long's Sentence

Long argues for the first time on appeal that his sentence was procedurally unreasonable because the district court treated his guidelines range as presumptively reasonable and failed to comply with the statutory prerequisites in 18 U.S.C. § 3553(a).

We review a final sentence under a deferential abuse-of-discretion standard.[11] <u>Gall v. United States</u>, 552 U.S. —, 128 S. Ct. 586, 591 (2007). Under

---

[10] Although the 1 November 2001 guidelines amendments — which eliminated the enhancement for scheming to defraud more than one victim and moved the mass-marketing enhancement into the victim-related specific offense characteristics as an alternative to the 2-level adjustment for an offense involving more than 10 but fewer than 50 victims — appear to bolster Long's argument that applying both enhancements would constitute impermissible double counting, we note that these amendments were in effect when we decided <u>Olshan</u> in 2004, and thus our holding in that case remains authoritative. <u>See</u> U.S.S.G. App. C, Amend. 617 at Reason for Amendment

[11] Although Long failed to object below to the procedural reasonableness of his sentence, we need not decide whether plain error is the appropriate standard of review because his sentence can be affirmed as reasonable.

this standard, we will reverse a sentence imposed by the district court only if we find that the district court has made a clear error of judgment, or has applied the wrong legal standard.  See United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).  A sentence may be procedurally or substantively unreasonable, or both.  See United States v. Hunt, 459 F.3d 1180, 1182 n. 3 (11th Cir. 2006).  A sentence may be procedurally unreasonable if the district court improperly calculates the guidelines range, treats the guidelines as mandatory, fails to consider the appropriate statutory factors, bases the sentence on clearly erroneous facts, or fails to adequately explain its reasoning. See Gall, 552 U.S. — , 128 S. Ct. at 597.

Once we determine that the district court has committed no significant procedural error, we review the substantive reasonableness of the sentence, which requires us to consider the factors outlined in § 3553(a) and the district court's reasons for imposing the particular sentence.  United States v. Williams, 435 F.3d 1350, 1355 (11th Cir. 2006) (per curiam).[12]  "The weight to be accorded any given

---

[12] The § 3553(a) factors the court must consider are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to the victims. See 18 U.S.C. § 3553(a)(1)-(7).

33

§ 3553(a) factor is a matter committed to the sound discretion of the district court," and "we will not substitute our judgment in weighing the relevant factors because our review is not de novo." United States v. Williams, 456 F.3d 1353, 1363 (11th Cir.) (quotation marks and citation omitted), cert. dismissed, 127 S. Ct. 3040 (2007), abrogated on other grounds by Kimbrough v. United States, 552 U.S. — , 128 S. Ct. 558 (2007). Although we do not apply a presumption of reasonableness to a sentence that is within the guidelines range, "ordinarily we would expect a sentence within the Guidelines range to be reasonable." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) (per curiam).

Upon review of the record, we conclude that Long's sentence was both procedurally and substantively reasonable. The district court correctly calculated Long's guidelines range, explicitly acknowledged that it had considered the parties' arguments as well as the § 3553(a) factors, and concluded that Long's 72-month sentence was sufficient but not greater than necessary to address the seriousness of the offenses and to provide just punishment. Given the nature of Long's crimes and his lack of remorse, we cannot conclude that his sentence was substantively unreasonable in light of pertinent section 3553(a) factors.

### III. CONCLUSION

Long appealed his convictions and sentences for conspiracy to commit mail

and wire fraud and substantive wire fraud. We conclude that: (1) the district court properly denied Long's motion to suppress; (2) the alleged trial errors, even when viewed cumulatively, did not amount to reversible error; and (3) there was sufficient evidence from which a reasonable jury could have found Long guilty of the charged offenses. We also find that Long's 72-month sentence was both procedurally and substantively reasonable. Accordingly, Long's convictions and sentences are **AFFIRMED.**